**2016 UT App 234**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ABELARDO CRUZ,
Appellant.

Opinion
No. 20140994-CA
Filed December 1, 2016

Eighth District Court, Vernal Department
The Honorable Clark A. McClellan
No. 131800746

Jeremy M. Delicino, Hakeem Ishola, and Carlos
Navarro, Attorneys for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES KATE A. TOOMEY and JILL M. POHLMAN concurred.

VOROS, Judge:

¶1   Abelardo Cruz appeals his conviction for two counts of
sodomy upon a child, a first degree felony. We affirm.

BACKGROUND

¶2   Cruz resided with Mother and her six-year-old daughter
(Child). On November 9, 2013 Cruz returned home on his lunch
break and went upstairs to "get some rest" in the bedroom.
Child also went upstairs. Later, Mother walked upstairs "very
softly" to get her phone. When Mother opened the bedroom
door, Cruz was lying on the bed, his pants were "wide open,"

"unbuttoned, and the zipper was down," and he looked scared. Child was lying on the bed next to Cruz "near his hips."

¶3    Mother took Child into the adjacent bathroom and asked her what had happened. Child appeared shaky and pale and initially responded that nothing had happened. When Mother asked again, Child responded that Cruz "put his tito in [her] mouth."[1] Although Cruz denied the incident, Mother left the family home the following week and moved with her children to another city.

¶4    Mother took Child to a hospital to determine if Child sustained any injuries from the November 9 incident. The examining doctor found no sign of injury. After examining Child, the hospital called the police to report allegations of sexual abuse.

¶5    A police detective interviewed Child at a Children's Justice Center (the first CJC interview). The detective conducted the interview in both English and Spanish. During the interview, Child told the detective that on the day of the alleged abuse, Child followed Cruz upstairs to the bedroom. Child explained that once she entered the room, Cruz put his hand on the door, and "he didn't let [her] out." Child told police that Cruz unzipped his pants, that she "was trying to get out," and that Cruz then "did something bad." The detective asked Child why Cruz wouldn't let her out of the room; she responded, "I didn't want to do it, but he made me do it. He made me put my mouth on his [tito]."[2] Later in the interview, Child repeated that Cruz "put his tito in my mouth."

---

1. At trial, Mother explained that "tito" is a "family word for penis." Child explained in her interview at the Children's Justice Center that, to her, "tito" means "nuts."

2. This portion of the interview was conducted in Spanish; translators translated "tito" as "weewee."

¶6 The following week a police officer conducted a second interview with Child at a separate Children's Justice Center (the second CJC interview). The officer conducted the interview mainly in Spanish. In the interview, Child explained that Cruz "put [her] up on the bed . . . on [her] knees" while his pants were unzipped. Child told the officer that Cruz "took his tito out" and told her not to tell anybody and "not to bite his tito." Child explained that Cruz directed her to suck his penis "like a popsicle." She reiterated that Cruz "put his tito in my mouth" and then her mother "walked in the door and she saw."

¶7 Before trial, the State moved for the admission of out-of-court statements by Child for presentation to the jury, and that the testimony of Child at trial be taken outside of the courtroom setting. The State sought to admit only the interview from the second CJC interview. Cruz opposed the State's motion and argued in the alternative that the court should show both interviews to the jury. The trial court ruled that the testimony was sufficiently reliable and trustworthy under rule 15.5 of the Utah Rules of Criminal Procedure and admitted both interviews into evidence. The State requested that the jury be allowed to take the videotaped interviews into the jury room during deliberations. Cruz objected, but the court allowed the video recordings into the jury room.

¶8 At trial, the jury heard both interviews with concurrent translation of the Spanish portions. In the first CJC interview the detective asked Child whether the alleged abuse happened "one time or more than one time," and Child responded that it had happened before "when [her] mom would work." When the detective asked "Every time?" Child provided a nonverbal response. The State requested that the record reflect "that when he asks the question 'every time,' the nonverbal answer in the video is a nod, an affirmative nod." The court granted the State's request and "indicate[d] for the record that the child moved her head up and down." When the detective asked if anything else happened, the court paused the video and stated, "[W]e need to reflect what happened." At this point, Cruz objected and

requested a hearing outside of the presence of the jury. The court finished playing the interview and excused the jury.

¶9     Cruz objected to the State's motion on the ground that "the jury could see for themselves if [there was] nodding." After the State presented its next witness, but before the court played the second CJC interview, the court instructed the jury not to consider its earlier statement about the head nod. The court stated that it did not "want [the jury] to consider [the court's] statement about the child moving her head up and down for any purpose." The court instructed the jury to "evaluate for [itself] whether or not the child did anything and what purpose you are going to apply if any to her conduct in response to that question . . . . Consider only what you saw on the video." Cruz cross-examined Child after the court played both interviews.

¶10     After the jury had deliberated for about 18 hours, the trial court gave a modified *Allen* instruction at the joint request of defense counsel and the State. *See State v. Ginter*, 2013 UT App 92, ¶ 4 n.2, 300 P.3d 1278 (defining an *Allen* instruction as a supplemental jury instructions to help a deadlocked jury reach a unanimous verdict). The trial court then asked the jury whether there was "any reasonable likelihood that continued deliberation [would] result in a unanimous verdict on any counts that you have not yet as a group been able to agree upon." The court asked the jury to return a response to the question "in a relatively short period of time." Thirty minutes later, the jury returned and informed the court that it had reached a unanimous verdict on some counts and that further deliberations would not be productive on the others. The jury convicted Cruz of two counts of sodomy on a child and aggravated kidnapping. It reached no verdict on four of eight counts and acquitted Cruz on one count.[3]

---

3. After trial, Cruz's conviction for aggravated kidnapping merged with his two counts of sodomy on a child.

ISSUES

¶11    Cruz raises five issues on appeal. First, he contends that the trial court erred when it allowed the Children's Justice Center video recordings into the jury room during deliberations.

¶12    Second, Cruz contends that the trial court erred by instructing the jury to assume that a non-verbal cue Child made in the first CJC interview constituted an affirmative response.

¶13    Third, Cruz contends that the trial court erred in granting the joint request of Cruz and the State to give the jury a modified *Allen* charge after the jury deliberated for over 18 hours.

¶14    Fourth, Cruz contends that the State presented insufficient evidence to convict Cruz of sodomy on a child.

¶15    Fifth, Cruz contends that the cumulative error doctrine requires reversal.

ANALYSIS

I. CJC Video Recordings

¶16    Cruz "makes no wholesale constitutional attack on the admission of [Child's] videotaped interviews." Rather, he "primarily objects to . . . the district court's determination that [Child's] uncross-examined hearsay testimony in the videotapes was so reliable and trustworthy that it should also be provided to the jury in deliberation." Cruz's challenge to the video recordings comprises three subpoints: (1) Child's statements were not reliable and trustworthy under rule 15.5 of the Utah Rules of Criminal Procedure; (2) he could not cross-examine Child until trial, over a year after the recorded interviews; and (3) due to the interviews' unreliability and Cruz's inability to cross-examine Child, the video recordings should not have followed the jury into deliberations. Whether the trial court correctly admitted the videotaped interviews into evidence

pursuant to rule 15.5 is a question of law that we review for correctness. *State v. Snyder*, 932 P.2d 120, 125 (Utah Ct. App. 1997).

A.     Reliability of Child's Testimony

¶17     Under rule 15.5 of the Utah Rules of Criminal Procedure, an oral statement of a child or other witness younger than 14 years of age that was recorded before charges were filed, "upon motion and for good cause shown," is admissible in court if eight enumerated conditions are met. Utah R. Crim. P. 15.5(a). One of these conditions requires the court to view the recording and determine "that it is sufficiently reliable and trustworthy and that the interest of justice will best be served by admission of the statement into evidence." *Id.* R. 15.5(a)(8).

¶18     On appeal, Cruz contends that "the district court's findings on the reliability and trustworthiness of the videotapes are truncated and should be reversed for clear error." He maintains that several factors weighed against reliability, such as Child's age and maturity; the "nature and duration of [the] abuse," including Child's exposure to adult sexual conduct in the home; lack of detail; and evidence of "coaching."

¶19     The State responds that in the trial court, Cruz invited the error he now alleges on appeal, that Cruz fails to marshal the evidence supporting the trial court's determination, and that in any event the trial court's ruling finds support in the evidence.

¶20     Our supreme court held in *State v. Winfield* that "under the doctrine of invited error, we have declined to engage in even plain error review when counsel, either by statement or act, affirmatively represented to the [trial] court that he or she had no objection to the [proceedings]." 2006 UT 4, ¶ 14, 128 P.3d 1171 (alterations in original) (citation and internal quotation marks omitted); *accord State v. Pinder*, 2005 UT 15, ¶ 62, 114 P.3d 551; *State v. Geukgeuzian*, 2004 UT 16, ¶ 9, 86 P.3d 742. The court added a gloss to that rule in *State v. McNeil*, 2016 UT 3, 365 P.3d 699. There, after objecting to certain evidence on hearsay

grounds and discussing the issue with the trial court, counsel acknowledged, "Okay, it's not hearsay." *Id.* ¶ 22. The supreme court rejected the State's invited error argument on the ground that counsel had not conceded the evidence was not hearsay "until [after] the trial court insisted that the detective's testimony was not hearsay." *Id.* The trial court's interpretation of the issue thus "was not invited by" defense counsel. *Id.* ¶ 23 (citation and internal quotation marks omitted). Reading *Winfield* and *McNeil* together, we conclude that a party who withdraws an objection in the face of the court's insistence that the objection lacks merit, and thereafter agrees with the court's conclusion, does not invite any resulting error; but a party who, without having objected to a proposed course of action, affirmatively represents that they have no objection to it, invites any resulting error.

¶21 Here, Cruz invited the alleged error. At no point did he object on the ground he now asserts on appeal—that the court erred in finding the recording "sufficiently reliable and trustworthy." Cruz lodged two objections below. First, he objected to the supreme court's interpretation of rule 15.5(a) in *State v. Nguyen*, 2012 UT 80, 293 P.3d 236. He objected to the supreme court's inclusion of a "good cause" requirement in rule 15.5(a)—in his words, the court "just ignored the language and interpreted it different." *See id.* ¶ 11 (holding that a separate showing of good cause to admit a recorded statement is not required under rule 15.5, but that good cause is established when the court considers all the factors in the rule and determines that the recorded statement is accurate, reliable, and trustworthy, and that its admission is in the interest of justice). Cruz's solution was to "go back and do the rule better so that we all understand the same English and get rid of the good cause showing." Cruz does not renew this argument on appeal.

¶22 After discussing the good cause issue, the trial court proposed to make findings on the eight conditions listed in rule 15.5, and Cruz stipulated to those conditions:

>     THE COURT: So let's go through the
> elements of 15.5 and see—
>
>     [DEFENSE COUNSEL]: I'll stipulate to
> those.

Nevertheless, the court made findings on each of the eight rule 15.5 conditions. After the court had devoted considerable time to the findings, Cruz interrupted:

>     [DEFENSE COUNSEL]: Can I say this. I'm
> not sure that you need to make all these temporary
> findings, because I don't agree with half the things
> you're saying.
>
>     THE COURT: Well, you don't have to agree
> with anything I'm saying.
>
>     [DEFENSE COUNSEL]: I don't, but what
> I'm saying—
>
>     THE COURT: [Counsel], let me make my
> findings.
>
>     [DEFENSE COUNSEL]: Let me ask—but I
> don't think you have to be that detailed about—
> because you're almost saying that in the long run
> it's going to be the jury that decides if there's
> something inconsistent. So I think all you need to
> determine—I don't think you need to get into that.

But the court continued making its findings. At one point, Cruz's defense counsel stated that he did not agree with the court's finding that Child's testimony did not contain inconsistencies, "but," he continued, "I don't think that you need to go there to be able to make it admissible." The court continued to make detailed findings based on the specifics of Child's statements. When the court finished, defense counsel stated, "Let me tell

you, I don't really care about the video coming in, and I don't care whether it's close[d circuit live testimony] or [a recording played] in court. So I'm not going to object to that."

¶23    But he added, "Okay, let me just tell you what my issues are." He first expressed concern that the supreme court had ignored rule 15.5's "good cause" requirement in *Nguyen*. Then he insisted that the prosecutor "only get[s] one shot": "If you play the video, you can't put the victim up there and ask her all the things that you already got in the video, because the video's your one shot." With that proviso, he stated, "I have no problem with the video coming in."

¶24    We agree with the State that Cruz invited the error he alleges on appeal. He never objected on the ground he now asserts on appeal and he repeatedly assured the trial court that he did not object to the CJC video recordings being played at trial. And although he now describes the court's findings as "truncated," in the trial court he argued that they were unnecessarily detailed.[4]

---

4. In any event, the trial court's findings are sufficient. The judge explained that he had viewed the videos twice and that he himself speaks Spanish. He found that the detective explained to Child the importance of telling the truth; that Child understood that she could answer "I don't know" to any question; that the detective explained to Child that she "could say good or bad things"; that the detective employed open-ended questions except to summarize or recap; that the detective "didn't plant anything in the child's mind except to ask a question in the alternative, such as 'Were you kneeling or were you laying or some other form on the floor or on the bed?'"; that the detective "didn't put words in her mouth"; that Child "on her own" described the charged conduct; that "there was internal consistency in her statements"; that Child's testimony was "linear and logical"; that Child used verbal formulations that a

(continued…)

B.     Cruz's Rights to Cross-Examination and Confrontation

¶25     On appeal, Cruz argues that the trial court's decision to provide the video recordings to the jury for deliberation "essentially denied Cruz both the rights of confrontation and fair trial." At trial Cruz noted that the recordings were made nearly a year earlier and that the delay between Child's statement and trial limited his ability to cross-examine her. Because a child's "understanding of time is difficult," he argued, it is "extremely difficult to cross-examine a child that's five or six years old about something that happened a year ago." The prosecutor responded that, although counsel's concern applied with greater force to children, his contention was "true for every human witness where a statement is recorded sometime in advance, shortly after events occur, but well in advance of trial." The court stated that it would proceed as provided in rule 15.5 of the Utah Rules of Criminal Procedure, "applying [rule 15.5] as I believe the law requires me to."

¶26     First, to the extent Cruz relies on the Confrontation Clause, his argument fails. As we have observed, the Supreme Court made clear "that there is no Confrontation Clause violation when the declarant appears for cross-examination at trial." *State v. Rhinehart*, 2006 UT App 517, ¶ 26 n.7, 153 P.3d 830 (citing *Crawford v. Washington*, 541 U.S. 36 (2004)). The Confrontation Clause places no constraints at all on the use of a prior testimonial statement "'so long as the declarant is present

---

(…continued)

sexually inexperienced child would be unlikely to use; that her descriptions included plausible details concerning her clothing; that Child's descriptions did not appear to be grandiose, exaggerated, or bizarre; and that Child did not appear to be coached or to be mimicking others' words. We cannot agree with Cruz that these findings are clearly erroneous or that they fail to support a finding of reliability. On the contrary, we consider them exemplary.

at trial to defend or explain it.'" *Id.* (quoting *Crawford*, 541 U.S. at 59 n.9). Here, Child was present at trial to defend or explain her recorded statements.

¶27    In arguing that he was prevented from adequately cross-examining Child, Cruz quotes at length from *State v. Villareal*, 889 P.2d 419 (Utah 1995). But that decision does not aid his case. In *Villareal*, the prosecutor introduced the confession of a co-perpetrator through a police officer. *Id.* at 423. The co-perpetrator took the stand but was "wholly nonresponsive" when Villareal attempted to cross-examine him about the charged conduct. *Id.* at 425. Our supreme court held, under pre-*Crawford* case law, that Villareal's Confrontation Clause rights were violated but that the violation was harmless beyond a reasonable doubt in light of other trial evidence. *Id.* at 423–26.

¶28    In the present case, Cruz's attempts at cross-examination were not stonewalled by a wholly unresponsive witness. On the contrary, Cruz did not attempt to cross-examine Child about the charged conduct. Instead, he conducted a very brief cross-examination that did not include questions about the allegations of abuse. Child testified on cross-examination only that a babysitter tended to her and her sisters when Mother worked and that Mother did not go over her testimony with her.

¶29    This issue is controlled by *State v. Nelson*, 725 P.2d 1353 (Utah 1986). In *Nelson*, as here, "the State fully opened the door for the defense on cross-examination to question the child concerning the substance" of her interview. *Id.* at 1357. "Yet on cross-examination, the defense made no attempt to follow up on the prosecution's opening." *Id.* Our supreme court concluded that defense counsel "may have elected to forego cross-examination regarding the incident, but that does not mean that the opportunity was not available." *Id.* "It is the opportunity to cross-examine that is guaranteed by the state and federal constitutions, not whether that opportunity is exercised. Under the circumstances, we find no denial of the right of confrontation." *Id.*; *accord State v. Pham*, 2016 UT App 105, ¶ 11, 372 P.3d 734. The same is true here. In his briefing, Cruz

repeatedly refers to Child's "uncross-examined videotaped interviews." But he chose not to cross-examine her about the incidents. And as *Nelson* makes clear, one who chooses not to cross-examine a witness cannot complain that he was denied his right to cross-examine or confront the witness. *Id.*

¶30    Cruz also contends that he was denied his right to cross-examine Child because her "videotaped interviews were not subjected to cross-examination until more than one year later." Cruz repeatedly refers to the fact that he had no opportunity to cross-examine Child in the approximately one year between her CJC interviews and trial. But he does not assert or cite any legal authority that would support a claim that the one-year delay denied him a speedy trial or otherwise constituted error. Accordingly he has not carried his burden of persuasion on appeal. *See* Utah R. App. P. 24(a)(9); *State v. Hawkins*, 2016 UT App 9, ¶ 60, 366 P.3d 884.

¶31    Cruz also contends that "although [Child] 'testified' at trial, it was impossible for his defense counsel to effectively cross-examine her regarding, *inter alia*, her non-responsive head movements." Consequently, Cruz asserts he was denied "the right to effective cross-examination on a matter central to guilt or innocence." But Cruz points to no ruling of the trial court that prevented him from cross-examining Child on any relevant question. Indeed, he never attempted to cross-examine her about her head movements, her allegations of abuse, or any other subject other than the two described above.[5]

¶32    Accordingly, Cruz has demonstrated no violation of his right to confront or cross-examine Child.

---

5. As we discuss below, *see infra* ¶ 58, Child's nonresponsive head movements were irrelevant to Cruz's guilt or innocence because they pertained to allegations of abuse for which Cruz was not convicted.

C.      Jury's Access to the CJC Interviews During Deliberations

1.      Admissibility of the video recordings

¶33   Cruz contends that the trial court erred when it allowed Child's "videotaped statements to go into the jury deliberation room." At trial defense counsel objected that the jury should not have the videos during deliberations "as a matter of due process and fairness." He argued that the videos were testimony, not exhibits, and thus should not be made available during deliberations. He argued further that "if I have a cross examination of [Child], my cross examination doesn't get to go to the jury room." The prosecutor argued that the video recordings were exhibits, and "exhibits go to the jury." The trial court ruled that the jury could have the videos during deliberations.

¶34   Cruz now argues that, "just as portions of transcripts of testimony [are] not permitted to go to the jury room so as not to over-emphasize the testimony of the witness," recorded CJC interviews "should also not be permitted in the jury room." Although Cruz references "fairness" and the Confrontation Clause throughout his argument, his analysis relies principally on rule 17 of the Utah Rules of Criminal Procedure. "[T]he interpretation of a rule of procedure is a question of law that we review for correctness." *State v. Bosh*, 2011 UT 60, ¶ 5, 266 P.3d 788 (citation and internal quotation marks omitted).

¶35   The current version of rule 17 permits the jury to take most exhibits into the deliberations:

> Upon retiring for deliberation, the jury may take with them the instructions of the court and all exhibits which have been received as evidence, except exhibits that should not, in the opinion of the court, be in the possession of the jury, such as exhibits of unusual size, weapons or contraband.

Utah R. Crim. P. 17(l). Our supreme court has explained that "section (l) of rule 17 limits the material the jury may have with them during deliberation to 'the instructions of the court and all exhibits which have been received as evidence.'" *Allen v. Friel*, 2008 UT 56, ¶ 32, 194 P.3d 903 (quoting Utah R. Crim. P. 17(l)). The supreme court has also stated that this rule "indicates that exhibits which are testimonial in nature should not be given to the jury during its deliberations." *State v. Carter*, 888 P.2d 629, 643 (Utah 1995), *superseded by statute on other grounds as recognized by Archuleta v. Galetka*, 2011 UT 73, ¶ 70, 267 P.3d 232. The court thus held in *Carter* that in a capital penalty phase "the transcript of all [prior] testimony . . . is admissible in oral form only and must not be introduced into evidence as an exhibit or given to the jury to use during deliberation." *Id.* (alteration in original) (citation and internal quotation marks omitted).

¶36   The law has "always excluded depositions and written testimony from being carried from the bar by the jury." *State v. Solomon*, 87 P.2d 807, 811 (Utah 1939).[6] "A written instrument, made an exhibit in the [case] but not consisting of testimony of a witness in the case, may of course be taken to the jury room the same as maps, diagrams, and other exhibits. But the testimony of

---

6. Cruz relies on an earlier version of the rule cited in *State v. Carter*, 888 P.2d 629 (Utah 1995). That version stated, "Upon retiring for deliberation, the jury may take with them the instructions of the court and all exhibits and papers which have been received as evidence, except depositions . . . .'" *Id.* at 643 (omission in original) (emphasis omitted) (quoting Utah R. Crim. P. 17(k) (1995)). The advisory committee note to the current rule explains why the reference to depositions was deleted: "The committee recommends removing depositions from the paragraph not in order to permit the jurors to have depositions but to recognize that depositions are not evidence. Depositions read into evidence will be treated as any other oral testimony." Utah R. Crim. P. 17 advisory committee note.

a witness is in a different category." *Id.* The court explained that the rationale for the rule sought to deny written evidence an "undue advantage":

> It may often happen that the testimony on one side is oral from witnesses produced before the jury, while the testimony for the other side on essential matters is in the form of depositions or in the transcript from testimony at a previous hearing. If the hearing lasts for any length of time and the jury takes the depositions or transcript to be read and discussed while the oral evidence contra has in a measure faded from the memory of the jurors, it is obvious that the side sustained by written evidence is given an undue advantage. The law does not permit depositions or witnesses to go to the jury room. Why should a witness be permitted to go there in the form of written testimony?

*Id.* The supreme court reaffirmed this rule and rationale in *State v. Davis*, 689 P.2d 5, 15 (Utah 1984), as we observed in *Shoreline Development Inc. v. Utah County*, 835 P.2d 207, 210 n.6 (Utah Ct. App. 1992). *Cf.* 2 *Handbook of Federal Evidence* § 403:2 (7th ed. 2016) (stating that federal courts are reluctant to send into the jury room recorded testimony given at a trial, including videotape recordings, tape recordings, and transcripts of testimony); 2 *McCormick on Evidence* § 220 (7th ed. 2016) (stating that writings and recordings that are testimonial in nature are typically not taken in with the jury, because courts view them as simply a different form of testimony that "should not be unduly emphasized over oral testimony in the case").

¶37 Here, the State argues that the video recordings were exhibits and therefore were properly allowed into the jury room; Cruz argues that the video recordings are testimonial in nature and thus should not have been allowed into the jury room. We agree with Cruz.

¶38 Our courts have described a video recording of a child's police interview as "recorded testimony," *State v. Nguyen*, 2012 UT 80, ¶ 12, 293 P.3d 236, and as "video testimony," *In re S.A.K.*, 2003 UT App 87, ¶ 5, 67 P.3d 1037. A recording of a child's interview taken by police for the purpose of prosecuting crime, which is then introduced at trial and subjected to live cross-examination, constitutes, for purposes of this rule, testimony—or, at the very least, falls within the category of "exhibits which are testimonial in nature" and thus "should not be given to the jury during its deliberations." *Carter*, 888 P.2d at 643.[7]

¶39 The concerns expressed by the *Solomon* court 77 years ago about "written testimony" apply with equal force to video recorded testimony. Whether a statement is recorded on paper, on magnetic tape, or on digital media, the same rule applies. A video recording of this type poses the same danger of undue emphasis as would the transcript of the witness's live trial testimony. Accordingly, the rationale for excluding written records of oral testimony from the jury deliberations applies with at least equal force to video records of oral testimony or its equivalent. As the New Jersey Supreme Court noted, "replay of a video recording is tantamount to having the witness testify a second time." *State v. A.R.*, 65 A.3d 818, 829 (N.J. 2013). "The video recording is the functional equivalent of a live witness, and can be particularly persuasive." *Id.* (citation omitted). That court concluded that "under no circumstances shall the jury have unfettered access to audio- or video-recorded statements in

---

7. There can be little doubt that a child's video-recorded statement, given under questioning from a police officer in anticipation of criminal prosecution, is classified as testimonial for purposes of the federal Confrontation Clause. *See State v. Bentley*, 739 N.W.2d 296, 299–302 (Iowa 2007) (collecting cases); *State v. Blue*, 2006 ND 134, ¶¶ 8–16, 717 N.W.2d 558 (collecting cases); *Coronado v. State*, 351 S.W.3d 315, 324 n.52 (Tex. Crim. App. 2011) (collecting cases).

the jury room during deliberations. Replay in open court permits the required record of the replay to be made." *Id.*

¶40    We emphasize that this rule does not apply to all video recordings; many video recordings shown in court are not testimonial in nature and so would ordinarily be permitted in the jury room unless they "should not, in the opinion of the court, be in the possession of the jury." Utah R. Crim. P. 17(l).

¶41    Accordingly, we hold that the trial court erred in sending the video recordings of the CJC interviews into the jury room during deliberations. But of course, not every trial error requires reversal.

2.    Prejudice

¶42    "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." *Id.* R. 30(a). Thus, errors that "are sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings" are harmless and do not require reversal. *State v. Verde*, 770 P.2d 116, 120 (Utah 1989). A "'reasonable likelihood'" requires a "'probability sufficient to undermine confidence in the outcome.'" *State v. Knight*, 734 P.2d 913, 920 (Utah 1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). In this case, the relevant "outcome" is Cruz's two convictions, both of which arose from his November 9 conduct.

¶43    The jury requested interpreters during deliberations, suggesting that they may have viewed the CJC video recordings. But even so, we see no reasonable likelihood that allowing the CJC video recordings into jury deliberations affected the outcome of Cruz's trial, for several reasons.

¶44    First, this case does not present the danger of over-emphasis described in *Solomon*, where the party benefitting from recorded testimony enjoys an undue advantage over the party sustained by oral testimony. At trial, Cruz presented no

testimony directly contradicting Child's account, nor did he cross-examine her about her allegations of abuse. Rather, he called an expert in child-interviewing techniques who opined that Child's "false beliefs" had been instilled by her mother. Consequently, this was not a she-said/he-said case; it was a she-said/but-she-was-coached case. Thus, both sides had an interest in the jury's scrutinizing Child's interviews. Indeed, in closing argument defense counsel stated, "You can watch the video[s] . . . . You can go and watch them. This is not necessarily a requirement, but I submit to you it should be." We understand that once a court has ruled counsel must make the best of the situation. But as we read it, counsel's statement goes beyond damage control. And his tactical choice makes sense given the defense strategy of claiming that Child was coached.

¶45 Second, the jury seems in fact not to have over-emphasized the CJC interviews. Cruz was charged with two counts of sodomy on a child and one count of aggravated kidnapping based on his November 9 conduct and five other sex crimes against Child based on earlier alleged conduct. The three November 9 charges were partially corroborated by Mother's account of walking in on Cruz and Child. *See infra* ¶ 48. After deliberating for 18 hours, the jury convicted Cruz of only the three November 9 counts and either acquitted him or deadlocked on the remaining charges. This mixed verdict suggests that the jury scrupulously sifted the evidence without undue emphasis on the CJC video recordings.

¶46 Finally, we agree with the State that the graphic nature of Child's description of the November 9 events guaranteed that jurors would remember it—perhaps despite their best efforts—with or without rewatching the CJC video recordings. Child clearly described oral sodomy. In fact, she quoted Cruz as telling her "not to bite it" but to suck it "like a popsicle."

¶47 Cruz responds with several arguments. He argues that Child might have parroted words she heard or described conduct she witnessed while sleeping in Mother's bedroom, where Mother and Cruz engaged in sexual conduct after the

children were—they believed—asleep. Cruz was free to, but did not, cross-examine Child concerning this theory. He did argue it in closing. But Cruz has not explained why a second look at the CJC video recordings would make the difference between the jury accepting or rejecting this theory.

¶48    Cruz also asserts that, absent medical evidence of abuse, "the State's case clearly was not a 'slam dunk.'" We agree with the assumption of this argument—that, when "assessing an error's harmfulness, we look, in part, to 'the overall strength of the State's case.'" *State v. Benson*, 2014 UT App 92, ¶ 30, 325 P.3d 855 (quoting *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992)). We also agree that no medical evidence corroborated Child's account of events on November 9. But other evidence did: Mother described opening her bedroom door to see Cruz lying on the bed with his pants unzipped and "wide open," and Child lying next to him near his hips. Mother testified that she pulled Child into the bathroom where Child, shaky and pale, told her that Cruz "put his [penis] in my mouth, but I'm afraid." Cruz denied that anything happened and questioned why Child would say such a thing. But Child never changed her story. Further, the doctor who examined Child testified at trial and explained that presenting without "evidence of injuries . . . is not terribly surprising." Given these and other record facts, we see no reasonable likelihood that the prosecution's case was so tenuous that not allowing the CJC video recordings into the jury room would have resulted in a more favorable result for Cruz.

¶49    In sum, Cruz has not shown a reasonable likelihood that the trial court's error "affected the outcome of the proceedings." *See State v. Verde*, 770 P.2d 116, 120 (Utah 1989).

## II. The Head Gesture

¶50    Cruz contends that the trial court erred when it stated in connection with one portion of the video recording, "I'll indicate for the record that the child moved her head up and down." Cruz "concedes that the district court attempted to alleviate the impact of its erroneous instruction." But Cruz further contends

that the trial court's comment was "so prejudicial and devastating . . . as to vitiate the mitigating effect of the court's curative instruction." (Citing *State v. Harmon*, 956 P.2d 262, 273 (Utah 1998).)

¶51 The State counters that "by affirmatively stating that he did not object to making the record as the prosecutor proffered, [Cruz] invited the trial court into the very error he now complains of." The State also argues that Cruz "affirmatively led the trial court into believing that the court's curative instruction was sufficient to cure any problems with describing [Child's] response."

¶52 We conclude that Cruz cannot prevail because any possible error was harmless.[8] Whether the appellant asserts preserved error or plain error—that is, whether the appellant claims to have objected to the alleged error or claims that the alleged error was so obvious that no objection was required—the appellant must demonstrate prejudice or harm to prevail. *See State v. McNeil*, 2016 UT 3, ¶ 25 n.3, 365 P.3d 699 ("The prejudice inquiry is sometimes referred to as a harmfulness inquiry."). "An error is harmful if, absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, [if] our confidence in the verdict . . . is undermined." *State v. Maestas*, 2012 UT 46, ¶ 37, 299 P.3d 892 (alteration in original) (citation and internal quotation marks omitted).

¶53 On appeal Cruz contends that the court erred by making a record of Child's nonverbal response and that the court's curative instruction was ineffective to cure the error. We

---

8. Our review of the record satisfies us that Cruz did preserve his claim. Although it took two tries for Cruz to object to the court's record of Child's nonverbal cues, Cruz did successfully object to the court's action.

conclude that the court's statement resulted in no prejudice for four reasons.

¶54    First, the prosecutor asked that "the record reflect" Child's head motion. Trial counsel frequently ask that the written record reflect a fact visible to those at trial but not captured by the written record. For example, in *State v. Simmons*, 759 P.2d 1152 (Utah 1988), a child sexual abuse case, the prosecutor requested, "Let the record reflect these are anatomically correct dolls." *Id.* at 1160; *see also In re D.D.*, 2016 UT App 148, ¶ 3, 377 P.3d 706 (per curiam) ("[I]f I could just for the record reflect that [Father] is here, he . . . showed up when the Court did announce and came through the door." (Alterations and omission in original)). Counsel make such requests with an eye toward ensuring that the record on appeal accurately reflects the nature of the evidence presented at trial. Such housekeeping requests are directed to the appellate court, not the jury.

¶55    Second, the prosecution's request conveyed no information to the jury that it did not already possess. The prosecutor requested that "the record reflect that when he asks the question 'every time,' the nonverbal answer in the video is a nod." But the jury could observe for itself that when the detective asked a particular question, Child responded with a nod. Even Cruz does not contend that the verbal description mischaracterized Child's head motion. We see no danger that verbalizing what the jury had just seen posed any risk of skewing the jury's verdict.

¶56    Third, the court gave a curative instruction. Curative instructions "are a settled and necessary feature of our judicial process and one of the most important tools by which a court may remedy errors at trial." *State v. Harmon*, 956 P.2d 262, 271 (Utah 1998). "In the absence of the appearance of something persuasive to the contrary, we assume that the jurors were conscientious in performing . . . their duty, and that they followed the instructions of the court." *State v. Curtis*, 2013 UT App 287, ¶ 25, 317 P.3d 968 (omission in original) (citation and

internal quotation marks omitted). Further, "curative instructions are ordinarily presumed on appeal to be effective." *Id.* (citation and internal quotation marks omitted).

¶57 Cruz argues that the trial court's curative instruction "was neither prompt nor effective." However, defense counsel did not challenge the timing or substance of the curative instruction at trial. Accordingly, the timing of the instruction does not persuade us to depart from the usual presumption that the jurors "were conscientious in performing . . . their duty, and that they followed the instructions of the court." *See id.*

¶58 Fourth, the jury acquitted Cruz of the charges in connection to which Child nodded her head. Cruz was charged with three counts relating to the November 9 events and five counts relating to conduct occurring before that date. Child's nonverbal response—the subject of Cruz's objection and the subsequent curative instruction—pertained to descriptions of the latter charges. The jury did not return a blanket conviction on all charges; they convicted Cruz of only those charges unrelated to Child's nonverbal responses. This fact demonstrates that the jury "was not improperly influenced" by the trial court's alleged error and that the jury "took its responsibilities seriously." *See State v. Toki*, 2011 UT App 293, ¶ 34, 263 P.3d 481.

¶59 For the foregoing reasons, nothing about the trial court's acceding to the prosecutor's request to make a written record of Child's nodding undermines our confidence in the outcome of the trial. *See State v. McNeil*, 2016 UT 3, ¶ 27, 365 P.3d 699.

## III. *Allen* Charge

¶60 Cruz contends that the trial court denied him "a fair trial under the Sixth Amendment by giving a premature and coercive *Allen* charge."[9] Cruz does not challenge the wording of the

---

9. Verdict-urging instructions are often referred to as "*Allen* charges." *State v. Lactod*, 761 P.2d 23, 29 (Utah Ct. App. 1988)

(continued…)

instruction given. Rather, he asserts that the court erred in two ways: first, by giving the instruction "before the jury indicated it was actually deadlocked"; and second, in "essentially [telling] the jury it expected a response in a relatively short order." Acknowledging that this claim of error is unpreserved, Cruz alleges plain error and ineffective assistance of counsel.

¶61 The State responds that Cruz cannot show prejudice under either doctrine. "Plain error claims and ineffective assistance of counsel claims share a 'common standard' of prejudice." *State v. Redcap*, 2014 UT App 10, ¶ 50, 318 P.3d 1202 (quoting *State v. Litherland*, 2000 UT 76, ¶ 31 n.14, 12 P.3d 92; *State v. Verde*, 770 P.2d 116, 124 n.15 (Utah 1989)).

¶62 To succeed on a claim of ineffective assistance of counsel, a defendant must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031. Proof of prejudice requires a showing "that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. "Failure to raise futile objections does not constitute ineffective assistance of counsel." *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546.

¶63 "In general, to establish the existence of plain error and to obtain appellate relief from an alleged error that was not objected to, the appellant must show the following: (i) [a]n error

---

(…continued)
(citing *Allen v. United States*, 164 U.S. 492 (1896)). We have upheld "the non-coercive use of *Allen* charges because we believe such charges to be a reasonable and proper exercise of the court's power to guide the jury to a fair and impartial verdict." *Id.* at 30. There is "no prescribed ritual of words indicating whether the language of an *Allen* charge is coercive." *Id.* (citation and internal quotation marks omitted).

exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful . . . ." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). An error is harmful if, due to the error, "our confidence in the verdict is undermined." *Id.* at 1208–09. "If any one of these requirements is not met, plain error is not established." *Id.* at 1209.

¶64 After 18 hours of jury deliberations, Cruz and the State proposed a modified *Allen* instruction. Cruz stated that the instruction did not "urge the verdict" and the State agreed. Before issuing the instruction, the court emphasized to the jury that it "wanted to give [them] an instruction and see where [they] were as far as continued deliberations" and that the jury should not "take this in any way as an attempt to cause [them] to hurry [their] process" if they were "progressing towards a resolution." The court gave a modified *Allen* instruction and posed two questions: "Question one, 'Have you reached a unanimous verdict on any of the Counts I through VIII?' Question two, 'Is there reasonable likelihood that continued deliberation will result in a unanimous verdict on any counts that you have not yet as a group been able to unanimously agree upon?'" The court then asked the jury to "talk about these questions, [and] get back with me in a relatively short period of time to let us know where you are in this matter."

A.    Timing of the Instruction

¶65 First, Cruz faults the trial court for giving the instruction "before the jury indicated it was actually deadlocked." The court "merely observed that deliberation had gone on quite long"—in fact, 18 hours. This challenge rests on the premise that giving an *Allen* charge before the jury indicates that it is deadlocked constitutes error. But Cruz cites no authority for this premise, nor does it appear to be the rule. *See United States v. Jones*, 608 F. App'x 822, 827 (11th Cir. 2015) ("Our precedent does not require . . . an express indication of deadlock before the district court gives an *Allen* charge." (omission in original) (citation and internal quotation marks omitted)); *Government of Canal Zone v.*

*Fears*, 528 F.2d 641, 644 (5th Cir. 1976) ("There is no requirement that the jury be deadlocked before [an *Allen*] charge is given."); *Loving v. State*, 947 S.W.2d 615, 619 (Tex. App. 1997) ("The courts of several states have held that the decision to give an *Allen* charge does not require a finding that the jury is deadlocked."). Indeed, this court has stated that "trial courts will be in a 'safe harbor' in terms of appellate review if they give the ABA instruction *before an impasse occurs*." *State v. Harry*, 2008 UT App 224, ¶ 25, 189 P.3d 98 (emphasis added).

¶66    Cruz has not demonstrated that the court erred, much less obviously erred, by instructing the jury when it did. Nor has he demonstrated that an objection by defense counsel would have been anything but futile. Accordingly, this claim fails.

B.    Requesting a Response "in a relatively short period"

¶67    Cruz next contends that the trial court erred when it told the jury, according to Cruz, that it "wanted a decision by the jury 'in a relatively short period.'" This request, he argues, "was undoubtedly coercive."

¶68    This characterization of the court's statement implies that it urged the jury to return a verdict in a relatively short period. In fact, the court emphasized that if the jury was "progressing towards a resolution," it should not view the instruction "in any way as an attempt to cause you to hurry your process." The court then asked the jury to consider two questions: (1) whether it had reached a unanimous verdict on any of the charges, and (2) whether continued deliberation would result in a unanimous verdict on any counts on which the jury had not yet been able to unanimously agree. The court added, "I'll ask you to talk about these questions" and "get back to me in a relatively short period of time to let us know where you are in this matter." In other words, the court did not ask the jury to return a verdict in a relatively short time. Rather, 18 hours into deliberations, the court asked the jury for a status report.

¶69    Cruz argues that this request "was undoubtedly coercive." As evidence of coercion, Cruz points to the fact that 30 minutes after receiving the court's request, the jury "acquitted Cruz on one count and deadlocked on others." We disagree. These few facts do not demonstrate that the court's request for a status report in a relatively short period conveyed "any suggestion that the jurors should surrender their individual views of conscience." *See State v. Thomas*, 777 P.2d 445, 448 (Utah 1989). This is especially so where the court explicitly told the jury not to consider the request "as an attempt to cause you to hurry your process."

¶70    Cruz has not demonstrated that the court erred in requesting that the jury return an answer to the court's questions within a short time, nor has he demonstrated that this request was coercive in any way. Therefore, his claims of plain error and ineffective assistance of counsel fail.

## IV. Sufficiency of the Evidence

¶71    Cruz contends that the evidence at trial was insufficient to convict him of sodomy on a child. Cruz argues that Mother's testimony lacked credibility, that Child could have reported sex acts she observed between Mother and Cruz, that Child's physical examination was inconclusive, and that a defense expert testified that Mother might have planted false memories in Child. He also points to the fact that the jury deadlocked on four counts and acquitted him on one. Acknowledging that this claim is unpreserved, Cruz alleges plain error and ineffective assistance of counsel.

¶72    Even where a sufficiency claim is preserved, the applicable standard of review is highly deferential. In assessing a claim of insufficiency of the evidence, "we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Maestas*, 2012 UT 46, ¶ 302, 299 P.3d 892 (citation and internal quotation marks omitted). We reverse "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that

reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (citation and internal quotation marks omitted). Also, "in reviewing the sufficiency of the evidence, we refuse to re-evaluate the credibility of witnesses or second-guess the jury's conclusion." *State v. Fedorowicz*, 2002 UT 67, ¶ 40, 52 P.3d 1194 (citation and internal quotation marks omitted).

¶73 Cruz's sufficiency claim founders under this deferential standard of review. Cruz was convicted on two counts of sodomy on a child. A person commits sodomy on a child if the person "engages in any sexual act upon or with a child who is under the age of 14, involving the genitals or anus of the actor or the child and the mouth or anus of either person, regardless of the sex of either participant." Utah Code Ann. § 76-5-403.1 (LexisNexis Supp. 2016).

¶74 Sex crimes are defined with great specificity and require commensurate specificity of proof. *State v. Pullman*, 2013 UT App 168, ¶ 14, 306 P.3d 827. *State v. Taylor*, 2005 UT 40, 116 P.3d 360, illustrates testimony sufficient to support a conviction for sodomy on a child. *Id.* ¶¶ 2–6. Like the child in the present case, the victim in *Taylor* was six years old on the date of the offense. *Id.* ¶ 2. "She explained that [the defendant] offered her 'half a dollar' to 'suck on his private,' which she described as tasting like urine." *Id.* ¶ 3. The State also introduced a note the child had written to her mother that read, with corrected spelling, "Bryan told me to suck on his private and I did it." *Id.* When asked to pinpoint the dates and times of the acts, her answers were imprecise. *Id.* ¶ 4.

¶75 As in *Taylor*, the evidence here was sufficient to support Cruz's convictions for sodomy upon a child. During the first CJC interview, Child stated that Cruz "put his hand on the door" and "didn't let me out." Child said, "I didn't want to do it, but he made me do it. He made me put my mouth on his [tito]." She also said that Cruz "put his tito in my mouth." In the second CJC interview, Child explained that Cruz "put me up on the bed . . . on my knees" while his pants were "unzipped." Child

told police that Cruz "took his tito out," told Child "not to tell anybody," and "not to bite his tito." Child said Cruz told her to suck his penis "like a popsicle." She reiterated that Cruz "put his tito in [her] mouth" and then her "mom walked in the door and she saw." Mother testified that she walked into the family bedroom and saw Cruz "laying down" on the bed, with his pants "wide open," "unbuttoned, and the zipper was down." Mother testified that she saw Child on the bed next to Cruz, near his "hip area."

¶76    Child thus described the crimes in detail, and Mother corroborated her account. Although Cruz points to evidence that might have caused the jury to question Child's account, we "may not reassess the credibility or reweigh the evidence, but must resolve conflicts in the evidence in favor of the jury verdict." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993); *see also State v. Cardona-Gueton*, 2012 UT App 366, ¶ 11, 291 P.3d 847 ("[I]t is the exclusive province of the jury to weigh the competing theories of the case, in light of the evidence presented and the reasonable inferences drawn therefrom, and to conclude which one they believe."). Based on the evidence presented at trial, we cannot conclude that "the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he . . . was convicted." *See State v. Holgate*, 2000 UT 74, ¶ 18, 10 P.3d 346 (citation and internal quotation marks omitted). We thus reject Cruz's sufficiency claim.

## V. Cumulative Error

¶77    Cruz argues that "cumulative error warrants reversal of Cruz's convictions and a new trial."

¶78    Under the doctrine of cumulative error or cumulative prejudice, "we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted); *see also State v. Campos*, 2013 UT App 213, ¶ 61, 309 P.3d 1160 (referring

to "cumulative prejudice"). By its nature, this doctrine has no application where only one error occurred. *See State v. Wach*, 2001 UT 35, ¶ 37 n.4, 24 P.3d 948 (stating that "because this case involves only one erroneous for-cause ruling, [appellant's] cumulative error argument fails"). Here, we have concluded that only one error occurred.[10] Accordingly, the cumulative error doctrine has no application in this case.

CONCLUSION

¶79    For the foregoing reasons, the judgment of the trial court is affirmed.

_____

10. In addition, with respect to Cruz's claim based on Child's head gesture, we concluded that "any possible error was harmless." By this we do not mean to imply that error did occur or might have occurred. Furthermore, we do not believe the court's statement had any effect on the verdict.