**2018 UT App 201**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROGER GLEN KLENZ,
Appellant.

Opinion
No. 20160742-CA
Filed October 25, 2018

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 151100151

Gregory W. Stevens, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES KATE A. TOOMEY and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1     Defendant Roger Glen Klenz appeals his convictions on
five counts of aggravated sexual abuse of a child, all first degree
felonies, and five counts of forcible sexual abuse, all second
degree felonies. He argues that the trial court erred by denying
his motion for a bill of particulars, admitting evidence of his
alleged other bad acts, admitting into evidence a detective's
statements having bearing on the credibility issues in the case,
and denying his motion to arrest judgment. We affirm.

BACKGROUND[1]

*The Charges*

¶2 In 2015, when Defendant's daughter (Victim) was fifteen years old, she told her mother and a family friend that Defendant had sexually abused her for around eight years. Victim and Defendant had gotten into a fight earlier that day, and Victim was crying. Victim initially refused to disclose why she was upset, explaining that Defendant told her that she "couldn't tell." Eventually, the family friend asked whether Defendant had molested her, and Victim said yes. When asked whether it was "more than that," Victim answered, "[Y]eah, it was a lot more than that."

¶3 Victim reported these allegations to authorities, and Defendant was arrested and interviewed by a detective (Detective). The State charged Defendant with thirty counts of sexual offenses. Specifically, he was charged with five counts of aggravated sexual abuse of a child for conduct occurring over a seven-year period ranging from "on or about November 03, 2006 through November 02, 2013," when Victim was under the age of fourteen. He was charged with five counts of rape of a child and five counts of sodomy upon a child. The Amended Information alleged that these crimes occurred over the two-year period from "on or about November 03, 2011 through November 02, 2013," also when Victim was under the age of fourteen. Additionally, Defendant was charged with five counts of rape, five counts of forcible sodomy, and five counts of forcible sexual abuse. The Amended Information alleged that these offenses occurred over about a two-year period from "on or about November 03, 2013 through June 6, 2015," after Victim turned fourteen.

---

1. "On appeal from a criminal conviction, we recite the facts from the record in the light most favorable to the jury's verdict." *State v. Pham*, 2015 UT App 233, ¶ 2, 359 P.3d 1284.

*Defendant's Motion for a Bill of Particulars*

¶4     Defendant filed a Motion for a Bill of Particulars and Demand for a More Definite Statement of the Date, Time and Place of the Alleged Offenses. Noting that he was charged with thirty counts of sexual offenses against Victim and asking for "more than a broad statement that the alleged crimes took place within spans of two years or seven years," Defendant asserted that he was entitled to "sufficiently precise information of the date, time and place of an alleged offense" in order to prepare a defense and to uphold his due process rights.

¶5     The trial court denied Defendant's motion, concluding that Defendant's constitutional right to notice had "already been satisfied by the information." It observed that a "'core defense'" of "'I didn't do it'" is not time-sensitive and concluded that Victim was "not required to give precise dates of each alleged offense." (Quoting *State v. Taylor*, 2005 UT 40, ¶ 18, 116 P.3d 360.) Thus, because Defendant was "able to prepare a defense and [was] not in danger of multiple prosecutions for the same crime," a bill of particulars was unnecessary.

*The Motion in Limine About Other Bad Acts Evidence*

¶6     Before trial, the State moved for the admission of evidence of four alleged incidents of other bad acts that occurred outside Box Elder County.[2] First, when Victim was fourteen years old and staying with extended family following her grandmother's death, Defendant allegedly had sex with Victim after finding her crying on a bed and suggesting she was upset about a boy and he knew "what [would] make [her] feel better" (the funeral incident). Next, on two trips to softball tournaments when Victim was thirteen or fourteen, Defendant allegedly had sex with Victim in their hotel

---

2. Defendant was charged only for acts that occurred within Box Elder County.

rooms (the softball trip incidents). Finally, when Victim was approximately thirteen years old, Defendant allegedly had sex with Victim in a van parked in a store parking lot (the parking lot incident). According to the State, the other bad acts evidence was admissible under rule 404(c) of the Utah Rules of Evidence as prior instances of sexual abuse and under rule 404(b) as it was offered for the proper noncharacter purposes of establishing Defendant's intent and of showing "Victim's credibility, . . . Defendant's method of using [Victim's] relationship with boys to justify the abuse, . . . [and that Defendant] used opportunities when he was alone with [Victim] to abuse her."

¶7      The trial court granted the State's motion to admit the other bad acts evidence, concluding that it was admissible under rule 404(c). That rule allows, "[i]n a criminal case in which a defendant is accused of child molestation," the admission of "evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged." Utah R. Evid. 404(c)(1). The court stated that "this enumerated purpose from rule 404 applies to the unique events the Victim can testify to in order to establish the context and credibility of her allegations." The court similarly concluded that the evidence was relevant under rules 401 and 402.

¶8      The court then conducted a balancing analysis under rule 403. On the one hand, it concluded that the evidence of uncharged instances of sexual abuse in this case had probative value because it allowed Victim "to provide testimony about the scope and context of the abuse." On the other hand, because the jury would be determining "what, if any, events occurred based on [its] determination of credibility of the witness," there would be a limited danger of unfair prejudice given that Victim would be describing only "additional incidents of abuse." (Citing *State v. Cox*, 2007 UT App 317, ¶¶ 33–34, 169 P.3d 806.) Accordingly, the court found that "the balancing test of rule 403 allow[ed] for the admissibility of the evidence."

*The Motion in Limine and the Interview Video*

¶9      On the eve of trial, Defendant moved to exclude certain portions of the video recording of his interview by Detective on the day of his arrest. He sought to exclude portions that "constitute inadmissible opinion testimony by the interrogating Detective about the strength of the evidence, [Detective's] comparison of this case to other cases, and [Detective's] belief in the credibility of the alleged victim." Defendant asserted that allowing the jury to view these portions would "usurp [its] function" and that the probative value of the evidence was substantially outweighed by the dangers of unfair prejudice or confusing or misleading the jury.

¶10     The court heard oral arguments on the issue during trial.[3] Defendant clarified that he objected only to the portions of the video during which Detective opined about the strength of the evidence and Victim's credibility. The State opposed redacting the video. The prosecutor explained that the video was necessary and "very compelling evidence" because it showed that Defendant never asked questions about the specific details of the alleged sexual abuse that Detective referenced during the interview and because it showed Defendant's "bizarre demeanor and behavior," which included laughing and joking. The prosecutor argued that if the defense asserted that Defendant was wrongfully accused, then the State intended to rely on the video to argue that Defendant's reactions during the interview were "very unusual" and "not the kind of behavior that [one] would expect to see from somebody who believes he's been wrongfully accused." The prosecutor also argued that redacting the video would suggest to the jury that the State had "something to hide" and asserted that all of Detective's statements were necessary to "help put things in context."

---

3. The trial court heard arguments and ruled on Defendant's motion before Detective testified.

¶11　The trial court denied Defendant's objection to portions of the video. It distinguished the cases Defendant cited in support of his position because they related specifically to instances of officers accusing suspects of lying and therefore were not "persuasive" with respect to "whether or not the video should come in." The court determined that because "none of [Detective's statements in the video] talk about any type of lying or deceit" and because the statements were merely "techniques" Detective used to talk to a suspect, it would not exclude any portions of the video.

*The Trial*

¶12　The case proceeded to a jury trial in 2016. Victim testified that Defendant started abusing her when she was seven years old and they lived in another state, and that it continued when they moved to Utah the next year. When asked to describe the first instance of abuse in Utah, Victim recalled that late at night while her mother was at work, Defendant came into her room and explained that he was "going to snuggle and stuff" with her. While her younger sister slept on the top bunk of the bed, Defendant touched Victim's breasts with his hands, and Victim let it happen because she thought it was normal. The touching then "escalated" to Defendant touching Victim's buttocks and vagina over her clothes.

¶13　Victim testified that this kind of touching was "common" but that Defendant also touched her under her clothes. When asked to describe one such incident, Victim said that Defendant told her he "wanted to snuggle," but then he "put his hand under [her] shirt and started taking it off and touching [her] boobs." He also "took off [her] pants and [her] underwear" and started "rubbing" her vagina.

¶14　Victim estimated that when she was younger, Defendant would come into her room and touch her "five to seven times a week," stating that all the instances of touching were "kinda all mashed [together] in [her] head." Defendant's touching

decreased in frequency as Victim grew older, yet it continued on a regular basis. Victim admitted that she did not disclose all of Defendant's abuse when she was first interviewed by authorities, explaining that she was "scared" and "not really comfortable" talking to the interviewer. But she testified that the touching occurred regularly both when she was younger than fourteen and after she turned fourteen.[4] She also testified that it occurred in her bedroom, in Defendant's bedroom, and on the couch in the basement living room.

¶15 According to Victim, her older brother (Brother) "sometimes" walked in while Defendant was abusing her. In particular, once Brother walked out of his bedroom, prompting Defendant to roll off the basement living room couch and throw a blanket over her (the couch incident). Though she did not recall whether Defendant was dressed, she remembered that she was not, and when Brother saw them, she covered up and "acted like [she] was asleep." Brother then "darted into the bathroom."

¶16 Victim testified about the other bad acts evidence that the trial court had deemed admissible, including the funeral incident, the softball trip incidents, and the parking lot incident.[5] The court instructed the jury that it could consider the other bad acts evidence for the limited purposes of "demonstrating an ongoing behavior pattern of the defendant" and/or "to show the

---

4. For the sexual touching against Victim while she was under the age of fourteen, the State charged Defendant with aggravated sexual abuse of a child. *See* Utah Code Ann. § 76-5-404.1 (LexisNexis 2012). For the sexual touching after Victim turned fourteen, the State charged Defendant with forcible sexual abuse. *See id.* § 76-5-404.

5. Because the jury acquitted Defendant of the rape and sodomy charges, we do not include the details of Victim's testimony regarding those allegations.

defendant's intent to arouse or gratify the sexual desire of any person."[6]

¶17 Brother also testified. He was eighteen years old at the time of trial and lived in the downstairs bedroom near the basement living room. Brother testified that in 2015, when he finished working the 5 p.m. to 1 a.m. shift at a fast-food restaurant, he would return to see Victim and Defendant on the couch in the basement living room. Sometimes Defendant and Victim would be on the couch watching a movie and it was "totally normal." But "[s]ome nights," Victim and Defendant would "both pop up" and "quickly sit[] back up" from lying on the couch, and as Brother approached, Victim would "adjust[] her bra straps" and clothes and Defendant would ask Brother about work in a "very quick and panicked tone." Brother said that he encountered Defendant and Victim on the couch like this more than ten times. On some occasions, Brother could not tell what Defendant and Victim were wearing; at other times, Brother observed that Victim was wearing clothes although he testified that "most of the time" she was not.

¶18 Brother also described the couch incident. *See supra* ¶ 15. According to Brother, one night when he emerged from his bedroom to go to the bathroom, he saw Victim on the couch, and, "as [he] walked out and opened the door, [Defendant] rolled off the couch" and either Victim or Defendant quickly covered Victim with a blanket. Though he could not see what Defendant was wearing, Brother saw that Victim was nearly naked and "exposed," with her underwear down to her knees and her shirt up to her shoulder, before he "quickly ducked into the bathroom." When Brother came out of the bathroom, Defendant was not there, but Victim had on sweatpants and a

---

6. The court instructed the jury about the other bad acts evidence at the time the evidence was admitted and in the final jury instructions.

t-shirt and appeared asleep. He testified that this incident left "a very vivid picture" in his mind.

¶19    Long before the couch incident, Brother saw Victim and Defendant leave Defendant's upstairs bedroom while everyone else was downstairs. According to Brother, as she left, Victim fixed her bra strap, putting it back on her shoulder, and adjusted her shirt. This episode "seemed very irregular" and "weird" to Brother, and he testified that this was the first "red flag" that "something was wrong." Brother suspected sexual abuse, estimating that his concerns arose around 2013. But because he was afraid of losing his dad and "didn't want to believe it," Brother did not tell anyone.

¶20    Brother detailed other unusual behavior. For example, he explained that Defendant gave people massages but the ones he gave to Victim, unlike those he gave to Victim's mother, were more "in depth," longer, and involved the use of oils. Brother also described a time when he heard "hushed whispers and face slaps" while in his bedroom. When he walked out of his room, he saw Victim crying, and when he asked why, Victim said, "I cannot live here anymore . . . I just want to move out." Defendant then came downstairs, and the conversation ended.

¶21    Brother testified that, after Victim reported her allegations against Defendant, Victim told Brother about where and how often the abuse happened, but "[t]here wasn't a lot said" and she "never went into extreme detail." And Brother did not know the "basic outline" and time frame of what happened until Child Protective Services interviewed him. On cross-examination, Brother acknowledged he never saw Defendant actually touch Victim in an inappropriate way.

¶22    Detective testified for the State. During his testimony, he stated that during the interview Defendant did not ask him for the details of the abuse allegations. He explained that "[p]eople that have not committed something are very adamant and strong with their denials." When the prosecution asked whether

anything about Defendant's demeanor caught his attention, Detective said, "Quite a few things." When asked to specify, Detective stated, "The lack of defiance, joviality when I would ask a question and then the excited utterances of oh geez, wow." Regarding lack of defiance, Detective explained, "If somebody is innocent, then they're always in my face, they're saying, there's no way this happened, you're lying, I can't believe you did this, this isn't true, this is false, things like that." Regarding excited utterances, Detective stated that "as [he] would explain the charges, following that, it would be, a: oh geez, or wow, things like that. Not common." Defendant did not object to this testimony bearing on his demeanor.

¶23 The State played the video of Defendant's interview during its case-in-chief. When it was played, the court instructed the jury, "The statements of Detective . . . on the video are not evidence or an expert opinion concerning evidence. Instead, they are and should be considered only as [Detective's] investigative technique."[7]

¶24 Testifying on his own behalf, Defendant denied touching Victim in a sexual way. He stated he loved Victim and would never hurt her.

¶25 In closing argument, the State argued that the case turned largely on corroboration and credibility. It referred to the instances of Victim's testimony that were corroborated by Brother, and the instances of Victim's testimony that were corroborated by Defendant. The State also asserted that, during his interview, Defendant did not comment or behave like "a person who's being wrongfully accused." Defendant countered in his closing argument that the video of the interview showed that "he made no admissions despite . . . [Detective's] efforts over and over again to try and trick him into believing that

---

7. The final jury instructions included the same admonition.

[Detective] had something to actually support [Victim's] allegations when in fact [he] didn't."

*The Verdict*

¶26    The jury returned a mixed verdict. It acquitted Defendant of all counts of rape of a child, rape, sodomy upon a child, and sodomy. But it found him guilty on all five counts of aggravated sexual abuse of a child and all five counts of forcible sexual abuse.

*The Motion to Arrest Judgment*

¶27    Defendant moved to arrest judgment on the basis of the inherent improbability and apparent falsity of Victim's testimony. In particular, he asserted that Victim's testimony was inconsistent about the frequency and number of times she was abused and that there were no specifics about the time or extent of the abuse. Defendant further contended that the evidence was insufficient to sustain the verdict given Victim's testimony and the lack of physical evidence.

¶28    The trial court denied the motion to arrest judgment. It concluded that Victim's testimony was not the only evidence of what occurred. For example, Brother testified that he suspected sexual abuse, and Brother and Victim each testified about the couch incident. The court also concluded that "Victim's testimony as to the frequency, location, and extent of the abuse was not drastically changing, but was consistent in that the abuse occurred." Indeed, "Victim's multiple disclosures were not inconsistent, but merely cumulative, and simply added more details in the later statements." (Quotation simplified.) Further, the court concluded that although there was no physical evidence of abuse, "there [was] testimony that speaks to why that is and additional corroborating evidence of [Defendant's] guilt." Accordingly, the court determined it was precluded from applying the "inherent[ly] improbable testimony theory as there [was] additional evidence supporting the jury's verdict" and

could not grant Defendant his requested relief. Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶29    Defendant raises three main issues on appeal. First, he contends that the trial court committed reversible error when it denied him a bill of particulars. We generally review a trial court's denial of a request for a bill of particulars for an abuse of discretion. *State v. Bernards*, 2007 UT App 238, ¶ 13, 166 P.3d 626. But we review the trial court's decision regarding the constitutional adequacy of the notice given to a criminal defendant for correctness. *See State v. Maese*, 2010 UT App 106, ¶ 6, 236 P.3d 155; *see also State v. Wilcox*, 808 P.2d 1028, 1031 (Utah 1991) (explaining that the reviewing court "accord[s] a trial court's conclusions of law no particular deference, reviewing them for correctness," and that "the question of the adequacy of the notice given [to a] defendant is one of law").

¶30    Second, Defendant contends that the trial court erred in admitting (1) evidence of his alleged other bad acts and (2) Detective's statements "vouching for the alleged victim's credibility, opining about the weight of the evidence, and assessing the innocence of the defendant." "We afford district courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (quotation simplified). A trial court abuses its discretion "if its decision to admit or exclude evidence is beyond the limits of reasonability." *Id.* (quotation simplified). Where Defendant failed to preserve certain evidentiary issues for appeal, however, *see infra* ¶ 60 n.12, he seeks our review under the plain error exception to the preservation rule, *see State v. Bond*, 2015 UT 88, ¶ 46, 361 P.3d 104 (listing the plain error doctrine as an exception to the preservation rule). Under the plain error standard, the appellant must show the existence of an

obvious and harmful error. *State v. Cox*, 2007 UT App 317, ¶ 10, 169 P.3d 806.

¶31 Last, Defendant contends that the trial court erred in denying his motion to arrest judgment. A trial court "may arrest a jury verdict when the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *State v. Black*, 2015 UT App 30, ¶ 12, 344 P.3d 644 (quotation simplified). We review the trial court's ruling on a motion to arrest judgment for correctness. *Id.*

ANALYSIS

I. Bill of Particulars

¶32 Defendant first contends that the trial court "erred in denying [his] motion for a bill of particulars." He asserts that "in light of the extreme breadth of the period charged in the Amended Information at issue here and the fact that [Victim] was not a young child at the time of trial," the notice he received of the time and place of the alleged offenses was deficient and "violated his right to due process" under the Utah Constitution. He further asserts that the trial court's error prejudiced his "ability to present any particularized defense." He contends "it was impossible for [him] to assert a defense as to any of the charges that did not place him in the time and place of the alleged offenses"—suggesting that he was prevented from raising an alibi defense—and that, with one exception, "the best that [he] was able to do was to assert a general defense that he did not ever" abuse Victim.

¶33 The State counters that Defendant "received constitutionally adequate notice of the date and time of the offenses" because it was "the best information the State had as to when the crimes took place." The State asserts that the Amended

Information "reflected the preliminary hearing testimony of [Victim], who could only say that the abuse occurred on almost a weekly basis, often multiple times a week . . . until she was 15 years old." It further argues that "because the abuse was pervasive and extended over a long period of time, the State was not constitutionally required to provide more precise times" and "the lack of specific dates did not . . . impair [Defendant's] ability to prepare a defense."

¶34    The Utah Constitution guarantees that "[n]o person shall be deprived of life, liberty or property, without due process of law," Utah Const. art. I, § 7, and that criminal defendants have the right "to demand the nature and cause of the accusation against [them]" and to be provided a "copy thereof," *id.* art. I, § 12. These guarantees ensure that the accused is "given sufficient information so that he or she can know the particulars of the alleged wrongful conduct and can adequately prepare his or her defense."[8] *State v. Bell*, 770 P.2d 100, 103 (Utah 1988) (quotation simplified). Thus, "the constitutional question is whether a criminal defendant is sufficiently apprised of the particulars of the charge to be able to adequately prepare his defense." *State v. Wilcox*, 808 P.2d 1028, 1031 (Utah 1991) (quotation simplified).[9]

---

8. The Utah Constitution also "requires the prosecution to state the charge with sufficient specificity to protect the defendant from multiple prosecutions for the same crime." *State v. Wilcox*, 808 P.2d 1028, 1032 (Utah 1991). Defendant does not assert that the lack of specificity in the Amended Information exposed him to multiple prosecutions for the same crime.

9. "When an indictment or information . . . does not provide the notice guaranteed by article I, section 12, the accused may request a bill of particulars . . . ." *State v. Bell*, 770 P.2d 100, 104 (Utah 1988). *See generally* Utah Code Ann. § 77-14-1 (LexisNexis 2017) ("The prosecuting attorney, on timely written demand of

(continued…)

¶35    To resolve this question, courts weigh "the completeness of the notice and its adequacy for the defendant's purposes against the background of the information legitimately available to the prosecuting authority." *State v. Taylor*, 2005 UT 40, ¶ 9, 116 P.3d 360 (quotation simplified). The State is required to "give the defendant the best information it has as to when the alleged crime[s] took place," and "whatever information the prosecutor has that may be useful in helping to fix the date, time, and place, of the alleged offenses." *State v. Robbins*, 709 P.2d 771, 773 (Utah 1985); *see also State v. Gulbransen*, 2005 UT 7, ¶ 27, 106 P.3d 734 (same), *abrogated on other grounds by Met v. State*, 2016 UT 51, 388 P.3d 447. Ultimately, "as long as a defendant is sufficiently apprised of the State's evidence upon which the charge is based so that the defendant can prepare to meet that case, the constitutional requirement is fulfilled." *Taylor*, 2005 UT 40, ¶ 9 (quotation simplified); *see also State v. Hattrich*, 2013 UT App 177, ¶ 40, 317 P.3d 433 ("Due process requires that an accused be given *sufficiently* precise notification of the date of the alleged

---

(…continued)
the defendant, shall within 10 days, or such other time as the court may allow, specify in writing as particularly as is known to him the place, date and time of the commission of the offense charged."); Utah R. Crim. P. 4(e) ("When facts not set out in an information are required to inform a defendant of the nature and cause of the offense charged, so as to enable the defendant to prepare a defense, the defendant may file a written motion for a bill of particulars. . . . The request for and contents of a bill of particulars shall be limited to a statement of factual information needed to set forth the essential elements of the particular offense charged."). "Entitlement to a bill of particulars as a matter of right occurs only when the information or indictment is constitutionally deficient by reason of its failure to inform of the nature and cause of the offense charged." *State v. Allen*, 839 P.2d 291, 298 (Utah 1992).

crime so that he can prepare his defense." (quotation simplified)).

¶36 Although a defendant is entitled to sufficient detail so that he can mount a defense, Utah law "does not . . . expressly mandate identification of the exact date when an alleged offense occurred." *Taylor*, 2005 UT 40, ¶ 9; *see also* Utah R. Crim. P. 4(c)(1) ("The information need not include facts such as time . . . unless necessary to charge the offense."). Moreover, "the mere assertion of an alibi defense does not impose on the prosecution the additional burden of proving the precise date of the act. The burden on the prosecution remains the same, i.e., to establish all elements of the crime beyond a reasonable doubt." *Gulbransen*, 2005 UT 7, ¶ 31 (quotation simplified). Defendant acknowledges that "[t]ime is not an express element of any of the offenses with which [he] was charged, except to the extent that the [State] was required to prove that [Victim] was a child at the time of commission of certain of the offenses." He thus concedes that the State was not required to identify the exact dates when the alleged offenses occurred.

¶37 The Utah Supreme Court has recognized that "in child sexual abuse prosecutions, identifying the specific date, time, or place of the offense is often difficult owing to the inability of young victims to provide this information." *Taylor*, 2005 UT 40, ¶ 12. Additionally, "[t]he problem of young children who are unable to specify a date on which abuse occurred or a location where it occurred is exacerbated by situations in which the abuse occurred on many occasions over a long period of time." *Wilcox*, 808 P.2d at 1033. Hence, the supreme court has been "less demanding of exact times and dates when young children are involved." *Taylor*, 2005 UT 40, ¶ 12; *see also Wilcox*, 808 P.2d at 1033 (acknowledging that Utah law is "less vigorous in requiring specificity as to time and place when young children are involved than would usually be the case where an adult is involved"). Thus, "so long as the elements of the crimes are covered by the factual allegations and the defendant is fully apprised of the State's information regarding the time, place, and

date of the crimes, any lack of factual specificity goes not to the constitutional adequacy of the notice, but to the credibility of the State's case." *Wilcox*, 808 P.2d at 1033. Otherwise, "[a]n abuser could escape prosecution merely by claiming that the child's inability to remember the exact dates and places of the abuse impaired the abuser's ability to prepare an alibi defense." *Id.*

¶38    Here, Defendant had sufficient notice of the alleged crimes and dates to allow him to adequately prepare his defense. The Amended Information notified Defendant that he was being charged for five counts of aggravated sexual abuse of a child committed against Victim over a seven-year period ranging from "on or about November 03, 2006 through November 02, 2013," and for five counts of forcible sexual abuse that occurred over the two-year period from "on or about November 03, 2013 through June 6, 2015." The Amended Information thus informed Defendant of the years, names, and elements of the offenses, and we agree with the State that it reflected Victim's preliminary hearing testimony, in which she could not provide specific dates but testified the abuse occurred almost weekly from the time she was eight years old until she was fifteen. In this regard, Defendant has not shown that the State failed to provide him with the best information legitimately available to it.[10] *Cf. State v. Otterson*, 2010 UT App 388, ¶ 4, 246 P.3d 168 (noting that the defendant failed to "provide any support for his claim that more detailed information could have been ascertained"); *State v. Bernards*, 2007 UT App 238, ¶ 18, 166 P.3d 626 (affirming the trial court's denial of a request for a bill of particulars in part because the defendant had "not demonstrated that the State withheld or attempted to withhold any information it had regarding the dates of the charged offenses").

---

10. Shortly after the State filed the Amended Information, Defendant had access to the transcripts of interviews with Victim, her mother, and her siblings.

¶39    Defendant points to the fact that Victim was sixteen years old and "not a young child" at the time of trial, and he suggests that this case is distinguishable from those cases in which notice of alleged periods of abuse has "been held to be sufficient in light of the age of the child victim." We are not persuaded. Defendant's abuse of Victim began when she was around seven or eight years old, and it recurred regularly until she was fifteen. Not only was Victim a young child for much of the abuse, but we see no reason why it would be easier for an older child to identify specific dates when the abuse is both pervasive and prolonged. Under these circumstances, Victim's imprecision about the dates of abuse does not undermine the adequacy of the State's notice to Defendant. *See State v. Wilcox*, 808 P.2d 1028, 1033 (Utah 1991) (indicating that "situations in which the abuse occurred on many occasions over a long period of time" exacerbate the problem of young children who are unable to specify a date on which abuse occurred); *see also State v. Bradley*, 2002 UT App 348, ¶ 49, 57 P.3d 1139 (stating that the defendant was "adequately notified of the time frame in which the alleged abuse occurred" even though the children, who were eight and ten years old, were "not able to specify exact times and dates of the alleged abuse").

¶40    Defendant further suggests that the lack of specificity in the Amended Information frustrated his attempt to raise an alibi defense. In *Wilcox*, the supreme court rejected a similar argument for two reasons. 808 P.2d at 1033. First, it explained that the defendant's use of an alibi defense does not transmute time into an element of an offense, nor does a defendant have a "statutory or constitutional right to a charge framed so as to facilitate an alibi defense." *Id.* Second, the *Wilcox* court doubted that "an alibi defense [was] a realistic possibility" for the defendant in that case. *Id.* The court explained that if the defendant "had had contact with the child only once or twice," specific dates and times would be "critical" and the lack of specificity therefore would "compromise[] the defense." *Id.* at 1034. But because the defendant instead had "continual contact

with the child half of the time" during the thirty-two-month period alleged in the information, the supreme court concluded that the defendant had not shown specific harm resulting from the lack of exact dates and times in the information. *Id.* at 1033.

¶41    The same two rationales apply here. Time is not an element of the offenses, and Defendant does not have the "right to a charge framed so as to facilitate an alibi defense." *See id.* Also, an alibi defense was not "a realistic possibility" where Defendant had "continual contact" with Victim over the seven-year period alleged in the Amended Information, and thus Defendant has not shown specific harm to his defense resulting from the lack of exact dates and times. *See id.*

¶42    For the foregoing reasons, we conclude that the State provided Defendant with constitutionally adequate notice of the date and time of the charged offenses and that the trial court did not err in denying Defendant's motion for a bill of particulars.

## II. Evidentiary Issues

¶43    Defendant next contends that the trial court erred in admitting two different types of evidence. First, he contends that the court abused its discretion in admitting evidence of his alleged other bad acts. Second, he contends that the court abused its discretion in admitting Detective's statements in the interview video and at trial. We address each issue in turn.

### A.    Other Bad Acts Evidence

¶44    Defendant contends that the trial court abused its discretion in admitting evidence of his other bad acts, namely, the funeral incident, the softball trip incidents, and the parking lot incident. For other bad acts evidence to be admissible, it must meet a three-part test that satisfies rules 404, 402, and 403 of the Utah Rules of Evidence: the other bad acts evidence (1) "must be offered for a genuine, noncharacter purpose," (2) "must be relevant to that noncharacter purpose," and (3) "the probative

value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *State v. Reece*, 2015 UT 45, ¶ 57, 349 P.3d 712 (quotation simplified).

1.      Noncharacter Purpose Under Rule 404

¶45    Rule 404(b) of the Utah Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). Yet such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2).[11] Thus, to be admissible under rule 404(b), the evidence must be "offered for a genuine, noncharacter purpose." *Reece*, 2015 UT 45, ¶ 57 (quotation simplified). Utah case law recognizes that one such proper noncharacter purpose is demonstrating "an ongoing behavior pattern which include[s] [the defendant's] abuse of the victim." *State v. Reed*,

---

11. Rule 404(c) "explicitly allows" evidence of other acts of child molestation to be introduced "for the purpose of proving a defendant's propensity to commit the child molestation with which he is charged." *State v. Cuttler*, 2015 UT 95, ¶ 26, 367 P.3d 981 (quotation simplified); *see also* Utah R. Evid. 404(c)(1). As used in rule 404(c), the term "child molestation" means "an act committed in relation to a child *under the age of 14* which would, if committed in this state, be a sexual offense or an attempt to commit a sexual offense." Utah R. Evid. 404(c)(3) (emphasis added). Victim testified that the funeral incident occurred when she was fourteen years old, that the softball trip incidents occurred when she was thirteen or fourteen, and that the parking lot incident occurred when she was "like 13 through 15." Because rule 404(c) may not have applied to all incidents, we will address the evidence of the other bad acts under rule 404(b).

2000 UT 68, ¶ 26, 8 P.3d 1025; *see also, e.g., id.* ("The evidence of multiple instances of sexual contact with the victim in this case does not merely demonstrate [the defendant's] general character or disposition, but instead demonstrates an ongoing behavior pattern which included [the defendant's] abuse of the victim."); *State v. Cox*, 2007 UT App 317, ¶ 31, 169 P.3d 806 (same); *State v. Devey*, 2006 UT App 219, ¶ 14, 138 P.3d 90 (same).

¶46 Like *Reed*, *Cox*, and *Devey*, the other bad acts evidence against Defendant—that he abused Victim outside of Box Elder County around the same time he was abusing her at home—was admitted for the proper noncharacter purpose of showing his ongoing pattern of abusing Victim. On appeal, Defendant has not distinguished the *Reed* line of cases or otherwise shown why the evidence was not properly admitted for this purpose. We therefore conclude that the trial court acted within its discretion by admitting the other bad acts evidence for a proper noncharacter purpose.

2.      Relevance

¶47 To be admissible, other bad acts evidence must be relevant to the noncharacter purpose for which it is offered. *Reece*, 2015 UT 45, ¶ 57. Under rule 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Utah R. Evid. 401; *see also id.* R. 402 (stating that relevant evidence "is admissible" unless otherwise provided by law). The trial court concluded that the other bad acts evidence here was relevant to the noncharacter purpose of establishing the context of Victim's allegations and her credibility. Because Defendant does not take issue with that conclusion, and because the evidence concerned Defendant's conduct with Victim and the charges in this case, *see Devey*, 2006 UT App 219, ¶ 14, we see no reason to disagree.

3.      Weighing Probative Value and Unfair Prejudice Under
        Rule 403

¶48    Defendant argues that the trial court should have
excluded the other bad acts evidence under rule 403, asserting
that its probative value was substantially outweighed by the
dangers of unfair prejudice, confusion, and misleading the jury.
In support, he asserts the other bad acts "suffer[] from the same
lapses in memory, lack of specificity and lack of corroborative
evidence of any type as does the charged conduct"; the other
incidents "differed in significant ways," as they "all occurred
away from home"; "there was no demonstrable temporal
proximity"; the State had no need for the evidence given that
"the jury gained nothing by hearing that the same witness was
also making other allegations against [him]" and that the State
had no need to establish motive and intent; "the alleged other
bad acts had no tendency to help establish disputed elements as
to charged conduct"; and the evidence had a "highly prejudicial"
effect.

¶49    Rule 403 gives the court discretion to "exclude relevant
evidence if its probative value is substantially outweighed by a
danger of one or more of the following: unfair prejudice,
confusing the issues, misleading the jury, undue delay, wasting
time, or needlessly presenting cumulative evidence." Utah R.
Evid. 403. Under this standard, "a court must determine whether
the probative value of the evidence is substantially outweighed
by its prejudicial effect." *State v. Ring*, 2018 UT 19, ¶ 23, 424 P.3d
845.

¶50    The trial court determined that the probative value of the
other bad acts evidence was not substantially outweighed by the
danger of unfair prejudice. On the one hand, it determined that
the evidence was highly probative for explaining "the scope and
context of the abuse." We agree. Victim's testimony about all of
Defendant's actions, including the other bad acts for which he
was not charged, had probative value because it "allowed
[Victim] the opportunity to 'describe the full scope of the context

of [Defendant's] conduct over the relevant time period.'" *See State v. Cox*, 2007 UT App 317, ¶ 33, 169 P.3d 806 (second alteration in original) (quoting *State v. Devey*, 2006 UT App 219, ¶ 15, 138 P.3d 90).

¶51 On the other hand, the trial court determined that the risk of unfair prejudice was limited. Again, we agree. Its rationale was that the other bad acts evidence involved other instances of abuse and "were essentially interchangeable, were of the same nature and character, and were carried out on the same victim during the same uninterrupted course of conduct." *See Devey*, 2006 UT App 219, ¶ 15 (quotation simplified); *see also State v. Reed*, 2000 UT 68, ¶¶ 26, 31, 8 P.3d 1025 (stating that "evidence of multiple acts of similar or identical abuse is unlikely to prejudice a jury" but instead "demonstrates an ongoing behavior pattern which include[s] [the defendant's] abuse of the victim"). Under such circumstances, "jurors will either believe or disbelieve the testimony based on [Victim's] credibility, not whether [Victim] asserts an act occurred three times or six," and the other bad acts evidence "does not have the prejudicial effect that may result from introduction of prior criminal acts committed against a number of unrelated victims." *See Reed*, 2000 UT 68, ¶ 31; *see also Cox*, 2007 UT App 317, ¶ 34.

¶52 We therefore agree with the trial court that the potential for unfair prejudice did not substantially outweigh the probative value of Defendant's other bad acts, and we conclude that the trial court did not exceed its discretion in admitting evidence of Defendant's other bad acts, including the funeral incident, the softball trip incidents, and the parking lot incident.

B.     Detective's Statements

¶53 Defendant contends that the trial court should have excluded several of Detective's statements that vouched for Victim's credibility, opined on the weight of the evidence, and assessed Defendant's innocence. We begin by setting forth the specific challenged statements, both in the interview video and

Detective's trial testimony. We then analyze the substance of Defendant's arguments on appeal and conclude that, even assuming the trial court erred in admitting the statements at issue, Defendant has not shown that he was prejudiced as a result.

1.      Statements Made During the Interview Video

¶54    On appeal, Defendant's challenge to Detective's statements in the interview video focuses on four segments, with the emphasized portions representing those statements that Defendant contends should have been redacted. The following exchange occurred between Detective and Defendant in the first segment:

> Detective: So, tell me when this has been going on?
>
> Defendant: I don't know what you're talking about. What, . . . I mean, I give my kids hugs and kisses just like every father. I don't, I mean, we have three other kids too. I mean . . . .
>
> . . . .
>
> Detective: She's alleging that it was just touching up until she was 12 years old and then from there it turned into sex.
>
> Defendant: Oh wow.
>
> Detective: *So I have some very, very specific, based on my training and experience, not-made-up, events, where she's alleging things have happened between you.*
>
> Defendant: Wow.
>
> Detective: *There's too much detail, and too much of everything else to show, there's too much trauma—*

Defendant: Oh, wow.

Detective:—*of what's happened*. And, you know, now's your time. Have you had sex with [Victim]?

Defendant: No!

Detective: Ever?

Defendant: No!

Detective: Have you ever touched her breasts?

Defendant: I may have, when we have little spats or something like that. What do you mean . . . ? I mean, are you talking like with my wife?

Detective: Yeah.

Defendant: No.

Detective: Have you ever touched her vagina?

Defendant: No.

¶55 The second segment included the following exchange:

Detective: *She's got specific allegations. And very, very detailed. And, kids aren't that way unless . . . trauma occurs. I've been a police officer for fifteen years. And I've been a sex crimes detective for three. And to get the detail that she's come up with and to be able to be consistent, to be able to ask her a question this hour, and come back this hour, and have every detail right on. Never happens.*

Defendant: That or a great imagination, one of the two.

Detective: *I've seen great imaginations and they always get out of control. . . . I've seen a thirteen-year-old create the novel 100 shades of gray . . . which was unfounded. Fifty shades of gray is pretty bad. But . . . you could tell he had never been sexually involved at all in his life because he had no idea how people's physical bodies worked in his disclosure. And I walked away and went, "Well, that one didn't happen," but this one* [while nodding his head].

¶56 The third segment included this exchange:

Detective: At this point in time I'm going to be booking you into jail for ten counts of rape of a child—

Defendant: Geez.

Detective:—and ten counts of aggravated sexual assault of a child.

Defendant: Oh my God.

Detective: There is a chance that it will go up from there, because there is a lot of disclosure going on here—

Defendant: Wow [while shaking his head]. Geez!

Detective:—*and it's very specific*.

¶57 The final segment, which occurred immediately after Detective notified Defendant of the charges for which he was being arrested, proceeded as follows:

Defendant: You've got to be joking, right?

Detective: No, . . . don't kid about this. This is—

Defendant: I'm not!

Detective:—*the evidence is staggering. I'll just say that*.

¶58 The trial court allowed the jury to hear all of these statements but gave the jury a limiting instruction directing that Detective's statements should be considered only as an "investigative technique."

2. Detective's Trial Testimony Assessing Defendant's Credibility

¶59 Defendant's challenge to Detective's trial testimony focuses on Detective's "opinion that [Defendant's] demeanor [during the interview] was inconsistent with that of an innocent man." Detective testified that "[q]uite a few things" stuck out about Defendant's demeanor. When asked to specify, Detective stated that Defendant showed a "joviality" and "lack of defiance" and Defendant made "excited utterances of oh geez, wow." Regarding lack of defiance, Detective explained, "If somebody is innocent, . . . they're saying, there's no way this happened, you're lying, . . . this isn't true, this is false, things like that." Regarding excited utterances, Detective explained that Defendant's answers like "oh geez, or wow, things like that" were "not directed" by Detective and that those kind of answers are "[n]ot common."

3. Analysis of the Challenged Statements

¶60 Defendant contends that the trial court erred in admitting Detective's statements. He asserts that those statements improperly intruded upon the "exclusive province" of the jury because they vouched for Victim's credibility, compared the weight of the evidence to other cases, and opined that Defendant's demeanor was inconsistent with innocence. He further argues that "the admission of those statements was prejudicial," given that the State's case "hinged entirely on" the

jury's assessment of Victim's credibility against Defendant's, there was "no physical evidence," "no one . . . corroborated [Victim's] story as a witness to any of the alleged crimes," and Detective "held himself out as an expert" in child sexual abuse cases.[12]

¶61 The State responds that neither the admission of Detective's interview statements nor his trial testimony warrants reversal. As to the interview statements, the State asserts that they "were not offered to bolster [Victim's] credibility" and instead "provided necessary context for the jury to understand" Detective's questions and Defendant's answers, "enabling the jury to assess the credibility of Defendant's answers." The State further asserts that the "jury understood those statements to be investigative techniques only" and that their admission was harmless. With respect to the admissibility of Detective's trial testimony that Defendant's interview responses were "unlike those from someone who is innocent," the State concedes that Defendant "has a point," but it asserts that "that testimony . . . is harmless." In support, the State refers primarily to Victim's

---

12. Defendant did not preserve his objection to Detective's trial testimony. He therefore seeks our review of this issue under the rubric of plain error. To succeed on such a claim, Defendant must demonstrate (1) an error that is (2) obvious and (3) harmful. *State v. Cox*, 2007 UT App 317, ¶ 10, 169 P.3d 806. Like Defendant and the State, we address together whether any prejudice resulted from Detective's statements in the video and his trial testimony. We ultimately resolve these claims of error on the basis of lack of prejudice. *See infra* ¶¶ 63, 65, 74. We also note that, while Defendant does not seek review of the issue regarding Detective's trial testimony under the rubric of ineffective assistance of counsel, "the prejudice test is the same whether under the claim of ineffective assistance or plain error." *State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699.

testimony, Brother's testimony that "substantially corroborated" Victim's testimony, and the mixed verdict.

¶62 Rule 608(a) of the Utah Rules of Evidence "bars direct testimony regarding the truthfulness of a witness on a particular occasion."[13] *State v. Adams*, 2000 UT 42, ¶ 14, 5 P.3d 642 (quotation simplified); *see also State v. Rammel*, 721 P.2d 498, 500 (Utah 1986) (explaining that any evidence that calls into question a witness's truthfulness "must go to *that* individual's character for veracity" and holding that a detective's testimony that "most suspects lie when initially questioned by police" "did not relate to [the accomplice's] character for veracity, but instead invited the jury to draw inferences about [the accomplice's] character based upon [the detective's] past experience with other suspects"); *State v. Bragg*, 2013 UT App 282, ¶ 31, 317 P.3d 452 (concluding that a "detective's testimony that [the victim] appeared 'to be genuine' during his interview was a direct comment on [the victim's] truthfulness and, as such, clearly violated rule 608"). The danger of such testimony is that it impermissibly invades the province of the jury, which has the duty to serve as "the exclusive judge of both the credibility of the witness and the weight to be given particular evidence." *Adams*, 2000 UT 42, ¶ 14 (quotation simplified).

¶63 While we are troubled by the admission of Detective's statements in the video and his trial testimony that suggest that Victim was credible and Defendant was not, we ultimately do not reach the question of whether the trial court properly admitted them. Rather, we accept the State's apparent

---

13. The rule states, "A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked." Utah R. Evid. 608(a).

concession that Detective's challenged trial testimony was erroneously admitted. And for purposes of our analysis, we assume without deciding that the trial court erred in admitting Detective's statements in the interview video. We resolve both claims of error based on our prejudice analysis, concluding that Defendant has not shown that he was harmed by the admission of the statements.

¶64     "[N]ot every trial error requires reversal." *State v. Cruz*, 2016 UT App 234, ¶ 41, 387 P.3d 618. "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." Utah R. Crim. P. 30(a). "Thus, errors that are sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings are harmless and do not require reversal." *Cruz*, 2016 UT App 234, ¶ 42 (quotation simplified). "A reasonable likelihood requires a probability sufficient to undermine confidence in the outcome." *Id.* (quotation simplified).

¶65     For three reasons, we see no reasonable likelihood that Detective's interview statements and trial testimony bearing on credibility affected the outcome of Defendant's trial. First, Brother's testimony provided compelling circumstantial evidence that corroborated Victim's testimony that Defendant touched her inappropriately. *See Bragg*, 2013 UT App 282, ¶ 32 (considering the strength of the evidence of the defendant's guilt in concluding that this court's "confidence in the jury's verdict [was] not undermined by the detective's testimony improperly bolstering [the victim's] credibility"). Victim testified that multiple times Defendant touched her breasts, buttocks, and vagina, both over and under her clothes, while they were on the downstairs couch. She also testified that Brother "sometimes" walked in on the abuse, and she described the couch incident, where Defendant rolled off the couch and threw a blanket over her, leaving her to pretend she was asleep before Brother "darted into the bathroom."

¶66    Brother corroborated this version of events by testifying similarly about the couch incident. According to Brother, when he opened the door of his bedroom one night, Defendant immediately rolled off the couch and a blanket was thrown over Victim. But before Victim was covered up and before he ducked into the bathroom, Brother saw that her underwear was down to her knees and her shirt was up around her shoulder. When Brother left the bathroom, he saw Victim dressed and appearing to sleep. Brother also testified about other similar scenarios. On multiple occasions he walked downstairs to see Victim and Defendant "both pop up" from lying on the couch, followed by Victim adjusting her bra strap and Defendant asking Brother questions in a "very quick and panicked tone." Although Brother never inquired about what he saw, Brother testified that "something was wrong" and he suspected sexual abuse.

¶67    Because of the similarities between Victim's and Brother's testimonies about the couch incident and about how Brother walked in other times when Defendant was abusing Victim, Brother's testimony provided circumstantial evidence corroborating Victim's testimony that Defendant touched her inappropriately. Defendant rejects the characterization of Brother's testimony as corroborative of Defendant's guilt, contending that Brother did not "actually observe[] any sexual activity involving [Defendant] and [Victim]," and that Brother "flatly contradicted" Victim's testimony regarding the events outside his room. We disagree.

¶68    Brother did not have to directly observe the sexual touching for his testimony to corroborate Defendant's guilt. *See State v. Stettina*, 635 P.2d 75, 77 (Utah 1981) (stating that corroboration of a crime "may consist of circumstantial rather than direct evidence"); *see also State v. MacNeill*, 2017 UT App 48, ¶ 57, 397 P.3d 626 ("The idea that circumstantial evidence is necessarily less convincing and of less value than direct evidence is a misstatement of the law. On the contrary, circumstantial evidence may even be more convincing than direct testimony." (quotation simplified)). His description of the couch incident

independently confirmed Victim's description of the event, including that Victim was undressed when Defendant quickly rolled off the couch.

¶69   Further, Defendant's contention that Brother's testimony conflicted with Victim's is not supported in his brief or by the evidence. Their testimonies regarding the couch incident were consistent on the material facts, and when counsel tried to discredit Brother's testimony by challenging his recollection about who threw the blanket over whom when he walked out of his room, Brother explained, "I wasn't paying attention to who was throwing the blanket over who. I was paying attention to the fact that my sister is naked and there's a blanket going over her and that is my dad rolling off the couch."

¶70   Thus, contrary to Defendant's contention, other corroborative evidence supported Defendant's guilt on those charges for which he was convicted, and this is not a case that hinged entirely on Victim's credibility.[14]

¶71   Second, the jury appears not to have overemphasized Detective's statements related to Victim's and Defendant's credibility. This case is similar to *State v. Cruz*, 2016 UT App 234, 387 P.3d 618. In that child sexual abuse case, which also involved a mixed verdict, this court concluded that no

---

14. *See, e.g.*, *State v. Stefaniak*, 900 P.2d 1094, 1096 (Utah Ct. App. 1995) (reversing a conviction because the case "*hinged entirely* on the credibility of the victim" and there was "not other evidence to support the defendant's conviction beyond that which is tainted by improper testimony" (emphasis added) (quotation simplified)); *State v. Iorg*, 801 P.2d 938, 942 (Utah Ct. App. 1990) (reversing a conviction in a case that hinged on credibility because the victim's "version of the events occurring the night of the alleged abuse was *aided only by the challenged testimony* of [the deputy], which was clearly calculated to bolster [the victim's] believability" (emphasis added)).

prejudice resulted from the trial court's error in allowing video recordings of the victim's interview into jury deliberations because, in part, the convicted conduct was "partially corroborated by [the mother's] account of walking in" on the defendant, "with his pants unzipped and 'wide open,' and [the victim] lying next to him near his hips." *Id.* ¶¶ 45, 48. Because the jury convicted on only the charges corroborated by the mother and either acquitted or deadlocked on the remaining charges, this court concluded that the "mixed verdict suggest[ed] that the jury scrupulously sifted the evidence without undue emphasis on the . . . video recordings."[15] *Id.* ¶ 45.

¶72 We reach the same conclusion here. Defendant was charged with ten counts based on inappropriate touching, as well as twenty counts based on both rape and sodomy. As discussed, and like the mother's account in

---

15. We recognize that under some circumstances a mixed verdict can indicate that "'the jury was conflicted about the evidence and the competing versions of events offered by the victim and' the defendant, and that therefore the elimination of certain evidence may very well have mattered." *State v. Burnett*, 2018 UT App 80, ¶ 39 (quoting *State v. Richardson*, 2013 UT 50, ¶ 44, 308 P.3d 526), *petition for cert. filed*, July 5, 2018 (No. 20180520). For example, in *Richardson*, the Utah Supreme Court concluded that the erroneous exclusion of sexual history evidence constituted harmful error where the case "turned on whether the jury believed [the defendant's] version of events or the victim's." 2013 UT 50, ¶¶ 41–45 & n.9. In so concluding, the supreme court explained that, under the circumstances of that case, it could not "reject the idea that the excluded sexual history evidence could have tipped the scales wholly in [the defendant's] favor." *Id.* ¶ 44. Given Brother's corroborating testimony, however, the circumstances of the case before us are much more like *Cruz* than *Richardson*.

*Cruz*, Brother's testimony corroborated Victim's testimony about the touching. *Supra* ¶¶ 65–70. Victim also testified that Defendant had raped and sodomized her. But where Brother did not testify that he witnessed what appeared to be sexual intercourse, his testimony was less probative regarding those specific acts, and the jury acquitted Defendant of the rape and sodomy charges. The jury therefore did not credit Victim's testimony in its entirety, despite hearing Detective's various statements about her credibility that had equal bearing on the touching, rape, and sodomy charges. The mixed verdict in this case thus strongly suggests it was the result of a reasoned application of the law to the facts rather than prejudice engendered by improper bolstering testimony. *See State v. Speer*, 750 P.2d 186, 189–90 (Utah 1988) ("[T]he fact that the jury acquitted defendant of two of the four charges indicates that the verdict was a result of a reasoned application of the law, rather than prejudice engendered by the improper evidence.").

¶73    Finally, we observe that the trial court twice instructed the jury that Detective's statements "on the video are not evidence or an expert opinion concerning evidence. Instead, they are and should be considered only as [Detective's] investigative technique." "In the absence of any circumstances suggesting otherwise, courts presume that the jury follows instructions." *State v. Reid*, 2018 UT App 146, ¶ 53 (quotation simplified), *petition for cert. filed*, Sept. 24, 2018 (No. 20180784). The limiting instruction in this case thus further mitigated the risk that the jury would convict based on Detective's statements in the interview video.

¶74    In light of these circumstances, Defendant has not shown a reasonable likelihood that any error in admitting Detective's challenged statements affected the outcome of the proceedings, and our confidence in the verdict is not undermined. *See Cruz*, 2016 UT App 234, ¶ 42. Accordingly, we decline to reverse on this basis.

III. Motion to Arrest Judgment

¶75   Finally, Defendant contends that we should reverse his convictions because the trial court erred when it denied his motion to arrest judgment "in light of the inherent improbability of [Victim's] testimony." In support, Defendant asserts that Victim's allegations had "troubling and glaring inconsistencies," including the "addition of new locations of the alleged abuse," an increase in the number of alleged incidents, and the kind of vocabulary she used to describe the abuse. He asserts that Victim's testimony was "unbelievably fanciful," citing her testimony that the abuse happened frequently, that it occurred when family members were in close proximity, and that she still went to softball tournaments with Defendant even when he was abusing her. Additionally, he asserts that Victim made "patently false" and "rehearsed" statements to "explain away [her] inconsistencies." He also asserts that because Brother "testified that he never actually observed any sexual activity" between Defendant and Victim, there was "no actual corroborative testimony" of Victim's allegations.

¶76   In evaluating whether to overturn a jury verdict on the ground that the evidence was insufficient to support a conviction, "we consider the evidence and all reasonable inferences therefrom in the light most favorable to the jury's verdict and uphold the verdict if we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *State v. Carrell*, 2018 UT App 21, ¶ 49, 414 P.3d 1030 (quotation simplified). Our role is not to reassess or reweigh the evidence; instead, we generally "resolve conflicts in the evidence in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (quotation simplified). But the Utah Supreme Court has carved out a narrow exception, under which "a court may choose to disregard certain testimony on a sufficiency of the evidence review if that testimony is 'inherently improbable.'" *Carrell*, 2018 UT App 21, ¶ 50 (quoting *State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288). This exception applies "only in instances

'where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt.'" *Prater*, 2017 UT 13, ¶ 33 (quoting *Robbins*, 2009 UT 23, ¶ 19).

¶77 On appeal, Defendant relies heavily on *Robbins*. In that case, a child accused her stepfather of sexual abuse, but her testimony "suffered from multiple inconsistencies" that she tried to cover up with "patently false statements." 2009 UT 23, ¶¶ 8, 22. The child's "inconsistent accounts" included statements about "the extent of the physical abuse she suffered, her age when the abuse occurred, and what she was wearing at the time of abuse." *Id.* ¶ 22. Though "a reasonable jury could have attributed those inconsistencies to the child's age and inability to accurately identify when an event took place," *Prater*, 2017 UT 13, ¶ 38 (citing *Robbins*, 2009 UT 23, ¶ 22), the supreme court held that "the patently false statements that [the child] made to cover up" the inconsistencies in her testimony were "sufficient to allow the court to reassess her credibility on a motion to arrest judgment," *Robbins*, 2009 UT 23, ¶ 22. In other words, the inconsistencies in the child's testimony, standing alone, were not sufficient to invoke the inherent improbability exception. *See id.* Rather, "[i]t was the inconsistencies in the child's testimony *plus* the patently false statements the child made *plus* the lack of any corroboration that allowed [the supreme court] to conclude that insufficient evidence supported [the defendant's] conviction."[16] *Prater*, 2017 UT 13, ¶ 38.

¶78 Defendant has not shown sufficient similarities between his case and *Robbins*. First, Defendant has not established that Victim's testimony was materially inconsistent. Given that it is not unusual for a child to testify "somewhat inconsistent[ly],

---

16. Significantly, in *Robbins*, "'no other circumstantial or direct evidence' supported the defendant's guilt." *State v. Prater*, 2017 UT 13, ¶ 42, 392 P.3d 398 (quoting *State v. Robbins*, 2009 UT 62, ¶ 19, 210 P.3d 288).

especially in sexual abuse cases," *State v. Wells*, 2014 UT App 13, ¶ 10, 318 P.3d 1251 (quotation simplified), the inconsistencies in Victim's testimony could be "explained by her age and lack of sophistication," *see Prater*, 2017 UT 13, ¶ 38 (citing *Robbins*, 2009 UT 23, ¶ 22); *see also id.* ¶ 39 (explaining that mere inconsistency with prior testimony does not render subsequent testimony "apparently false" because "the question of which version of [the witnesses'] stories was more credible is the type of question we routinely require juries to answer" (quotation simplified)). We also agree with the trial court's assessment that "Victim's testimony as to the frequency, location, and extent of the abuse was not drastically changing, but was consistent in that the abuse occurred." And, unlike *Robbins*, Defendant has not identified any patently false statements. Finally, there was other evidence of Defendant's guilt apart from Victim's testimony. In particular, Brother testified that he suspected sexual abuse was happening, and Brother and Victim each testified to a specific instance in which abuse occurred downstairs outside Brother's room.

¶79   In sum, we conclude that Victim's testimony was not inherently improbable. We further conclude that Victim's testimony, along with the corroborating evidence, was sufficient to support the jury's verdict. *See State v. Garcia-Mejia*, 2017 UT App 129, ¶ 27, 402 P.3d 82 (refusing to reevaluate the fact-finder's credibility determinations where corroborating evidence distinguished the case from *Robbins* and where "any inconsistencies in the boys' testimonies can be explained by their age and lack of sophistication, and there were no patently false statements made" (quotation simplified)). The trial court therefore did not err in denying Defendant's motion to arrest judgment.

CONCLUSION

¶80   We conclude that Defendant has not shown that he received constitutionally deficient notice of the charges against

him. Defendant failed to show that the trial court exceeded its discretion in admitting evidence of other bad acts and that he was prejudiced by the admission of Detective's statements bearing on credibility. He also failed to show that the trial court erred in denying his motion to arrest judgment. Accordingly, we affirm Defendant's convictions.

—————