**2019 UT App 143**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RICHARD DREW RHODES,
Appellant.

Opinion
No. 20170064-CA
Filed August 22, 2019

Second District Court, Ogden Department
The Honorable Joseph Bean
No. 151900727

Emily Adams and Cherise M. Bacalski, Attorneys
for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

APPLEBY, Judge:

¶1 Richard Drew Rhodes appeals his convictions for one count of aggravated sexual abuse of a child and four counts of sodomy upon a child and raises three issues on appeal. First, he argues the district court erred in excluding evidence under rule 412 of the Utah Rules of Evidence. Second, he argues the court plainly erred in allowing the jury, during its deliberations, to view the victim's (Child) interview at the Children's Justice Center (CJC). Finally, he argues his trial counsel was ineffective for failing to call a helpful defense witness; Rhodes filed a rule 23B motion under the Utah Rules of Appellate Procedure to

supplement the record regarding this claim. We deny Rhodes's rule 23B motion and affirm his convictions.

BACKGROUND

*The Abuse*

¶2     Child was raised by his grandmother (Grandmother) who had custody of him because his mother (Mother) struggled with drug addiction. Grandmother often worked late and had her daughter (Aunt) look after Child. Child slept at Aunt's house when she took care of him. Three of Aunt's four roommates, including Rhodes, were registered sex offenders. When Child visited Aunt's house, Rhodes helped look after him. Rhodes took Child to the movies, out to eat, and to the arcade. Rhodes bought Child clothes, toys, video games, food, and candy. Rhodes began to hold himself out as Child's father-figure.

¶3     Rhodes also became close with Grandmother and she thought of him as a family friend. She did not know Rhodes was a registered sex offender and thought Rhodes was someone she could trust to take care of Child. Rhodes even started calling Grandmother "Mom." After Rhodes cultivated this relationship, Grandmother sometimes asked him to babysit Child when Aunt was unavailable. Child stayed with Aunt or Rhodes a couple of nights a week. When Child stayed at the house Rhodes often had Child sleep with him in the same bed.

¶4     The other roommates noticed that Rhodes was possessive of Child and spent all of his time with Child when Child came over to the house. The roommates saw Rhodes "cuddle" Child on the couch and "spoon while [they] were watching a movie, or lay in the bed together." When Rhodes had Child in his bedroom, he would often shut the door. While in the bedroom together Rhodes showed Child pornography. Rhodes also performed oral sex on Child and made Child perform oral sex on

him. Child remembered this happening more than fifteen times throughout the years he spent at the house.

¶5     At some point, Grandmother learned that Rhodes was a registered sex offender and called Aunt. Rhodes went to Grandmother's house and told her he thought she knew about it. Rhodes told her that when he was eighteen, he had a boyfriend who was sixteen or seventeen and when his boyfriend's parents found out about the relationship, they "turned [Rhodes] in." Grandmother believed this story and continued to allow Child to go to the house. But what Rhodes told her was untrue and Grandmother testified that if she had known the "real story" she would not have permitted Child return to the home. What Rhodes did not tell Grandmother was that he was convicted for sexually abusing a ten-year-old girl when he was seventeen. He also did not disclose that he was convicted for sexually abusing a thirteen-year-old boy a few years later. He was initially placed on probation, but he violated it and was sent to prison. Shortly after he was released from prison, he moved into the house with Aunt and began interacting with and abusing Child.

¶6     One day in 2013, Child was playing video games at the house and Rhodes walked in and told him it was time for bed. Rhodes set up a "pull-out couch" and told Child to come sleep with him and "spoon[ed]" Child. Child's great-aunt (Great-aunt) came upon Rhodes and Child, and the way the two were positioned made her feel uncomfortable. Great-aunt took Child away from Rhodes and put him in Aunt's room. Rhodes went to Aunt's room and asked why he was not allowed to sleep with Child. Aunt told him she "didn't think it was right the way [Rhodes] was . . . holding him in the bed." The next morning Great-aunt called Grandmother because she was worried about this incident. Grandmother came to pick up Child and he "jumped into the backseat [of Grandmother's car and] locked all the doors." On the ride home Grandmother asked Child if something was wrong. Grandmother told Child that "if anybody

does or says anything to make [him] feel uncomfortable," he could tell her about it. Child asked, "Even if it means they are going to go to prison?" Grandmother said yes and asked him again if anyone made him feel uncomfortable. Child thought for a minute, then said "no."

¶7     At the time Child was seeing a therapist for abandonment issues with Mother. Child had an appointment a few days after the spooning incident and Grandmother let the therapist know she was concerned that Rhodes was sexually abusing Child. The therapist told Grandmother to report the abuse to the police and the two came up with a safety plan for Child.

¶8     Several days later, a neighbor found Child naked with her eleven-year-old son. Child had suggested that the two play a "game big people" play. Child told his friend they needed to remove their clothes to play, which they did, and then they touched each other's penis and anus. The incident was reported to Child's therapist and the Division of Child and Family Services (DCFS) got involved.[1] The DCFS report described the incident with the neighborhood friend and also mentioned that an adult male had been taking Child to movies and providing Child with gifts. It stated that the man was a family friend and that Child had not disclosed any sexual abuse by him.

¶9     A DCFS investigator spoke to Grandmother and Aunt and learned about Rhodes's relationship with Child. They disclosed the spooning incident with Rhodes and the incident with the neighborhood friend. DCFS arranged for Child to be interviewed at the CJC. During the interview Child did not disclose any abuse. DCFS closed the investigation because the perpetrator of the alleged abuse remained unknown.

---

1. The record does not show who contacted DCFS.

¶10   In 2015, Child got a cell phone for Christmas. Mother, who was now living with Child and Grandmother, caught Child looking at pornography on the phone. She asked him where he learned about pornography and he told her Rhodes showed it to him. A couple of months later, Mother observed Child watching pornography again and asked him why. Child responded that he could not "get out of his head what [Rhodes] did to him." Mother asked him what that was and Child responded that Rhodes touched him. He told Mother that Rhodes made him lie down on the bed and that they performed oral sex on each other.

¶11   Grandmother learned about Child's disclosure to Mother and asked whether he wanted to talk to the detective he spoke to at the CJC and Child responded that he was "ready to tell." Child met with the detective for a second CJC interview and disclosed that Rhodes made him watch pornography, touched his penis, performed oral sex on him, and made Child perform oral sex on Rhodes.

*The Proceedings*

¶12   After Child's second CJC interview in 2015, the State charged Rhodes with one count of aggravated sexual abuse of a child and four counts of sodomy upon a child.

¶13   Prior to trial Rhodes sought to admit evidence of the incident with the neighborhood boy under an exception to rule 412 of the Utah Rules of Evidence (412 Evidence), which generally prohibits the use of evidence of a victim's other sexual behavior. He argued that the 412 Evidence was admissible under the exception in rule 412(b)(3) because excluding the evidence would violate his constitutional right to present a defense. Specifically, he argued that a significant portion of his defense was that Child was abused by someone other than himself. The State responded by arguing that Rhodes could present this defense through other means without bringing in the 412 Evidence. The district court ruled that the 412 Evidence was

inadmissible and that Rhodes was required to do more than show that it would be "helpful" to his defense. It concluded that Rhodes's claims of Child being confused about the identity of his perpetrator were speculative and agreed with the State that Rhodes could present this defense through other means.

¶14   During trial, Grandmother testified on direct examination about her reaction to the spooning incident in 2013 and stated that she let his therapist know she was worried he was being sexually abused.

> State: Did you make the counselor aware of anything?
>
> Grandmother: Yes. [Child] just happened to have an appointment, I believe it was two or three days [after the spooning incident]. And I let his therapist know.
>
> State: Okay. Now did you contact law enforcement?
>
> Grandmother: I did not.
>
> State: Why not?
>
> Grandmother: Because I didn't know anything for certain. [Child] had not told me anything.
>
> State: Okay. Are you aware of whether or not [Child] told anybody else?
>
> Grandmother: He told . . . his therapist.
>
> State: He told his therapist[?]
>
> Grandmother: Uh-huh [affirmative].

¶15    Rhodes did not object to this testimony. Then, when Rhodes was cross-examining a detective about what prompted the 2013 investigation, the State asked for a bench conference and argued that the questioning risked violating the court's order regarding the 412 Evidence. In response, Rhodes argued that after Grandmother's testimony, the jury was "left with a misimpression as to how [the 2013] investigation began." Rhodes argued that he could stay within the bounds of the court's order while signaling to the jury that "an independent investigation was underway on an unrelated matter, and that [Rhodes's] name came up" but that he was later excluded as a suspect and the case was closed. The State argued in response that the 2013 investigation was not independent and was initiated, in part, because "Rhodes was caught spooning [Child]" and that starting to introduce "some independent investigation [will be] misleading to the jury." The court ruled that the only evidence Rhodes could elicit about what prompted the 2013 investigation would be testimony that "the investigation was initiated based on a report of inappropriate touching."

¶16    At trial, the two CJC interviews were played for the jury and admitted as exhibits. The court advised the jury of the admission of the interviews and told it that it would be able to re-watch them during its deliberations. Rhodes did not object. During closing arguments, Rhodes argued that the reliability of the second CJC interview from 2015 was "[v]ery, very poor" and he highlighted several concerns he had with it. He repeatedly urged the jury to watch the interviews carefully during its deliberations and stated, "I strongly encourage you, watch the videos. Take your own notes. Stop it. Rewind it. Look at it again." He emphasized that the jury should "[l]ook at the whole thing. Look at both videos" and "[l]isten carefully." The State also emphasized to the jury the importance of watching the interviews and told it to focus on how Child "behaved" in them.

¶17 At the end of trial, the court was discussing timing with the parties and Rhodes requested it not send the jury back to deliberate that evening because he did not want it to "make a quick decision." He added that he wanted the jury "to watch the video and do other things. And to pressure them into doing that tonight I think works unfairly against [Rhodes]." The parties agreed to complete closing arguments in the afternoon and call the jury back the following morning for deliberations. Before deliberations, the court arranged for the jury to have a computer so it could watch the interviews.

¶18 The jury found Rhodes guilty on all counts. The court sentenced Rhodes to fifteen years to life on the aggravated sexual abuse charge and twenty five years to life on each sodomy charge, running consecutively. Rhodes appeals.


ISSUES AND STANDARDS OF REVIEW

¶19 Rhodes raises three issues on appeal. First, he argues the district court erred in excluding the 412 Evidence. "[A] trial court's decision to admit or exclude evidence under rule 412 is reviewed under an abuse of discretion standard." *State v. Beverly*, 2018 UT 60, ¶ 23, 435 P.3d 160. He also argues his counsel was ineffective for failing to object to Grandmother's testimony, which he claims created a misimpression that Child disclosed the abuse to his therapist in 2013. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Lane*, 2019 UT App 86, ¶ 15, 444 P.3d 553 (quotation simplified).

¶20 Second, Rhodes argues the district court plainly erred in allowing the jury to view the CJC interviews during its deliberations. But we decline to conduct a plain error review because Rhodes's trial counsel invited the error by stipulating to the admission of the interview and emphasizing the importance of allowing the jury to review it during its deliberations. *See State*

*v. Ring*, 2018 UT 19, ¶ 16, 424 P.3d 845 (declining to conduct a plain error review when the parties invited the court to commit an error).

¶21 Third, Rhodes argues his trial counsel was ineffective for failing to call a helpful defense witness and requests a temporary remand under rule 23B of the Utah Rules of Appellate Procedure to supplement the record with evidence to support this claim. In determining whether a rule 23B remand is appropriate, we assess whether Rhodes has made "a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Dominguez*, 2019 UT App 116, ¶ 14 (quotation simplified).

ANALYSIS

I. Rule 412 Evidence

¶22 Rhodes makes two arguments regarding the exclusion of the 412 Evidence. First, he argues the district court abused its discretion in excluding the 412 Evidence before trial. Second, he argues his counsel was ineffective for failing to object to Grandmother's testimony, which he contends erroneously suggested that Child disclosed the abuse to his therapist in 2013.

A. Pre-trial Ruling

¶23 Rhodes first argues that the district court erred in refusing to grant his motion to admit evidence of the incident with the neighborhood boy under rule 412 of the Utah Rules of Evidence. This rule provides that "evidence offered to prove that a victim engaged in other sexual behavior" or "evidence offered to prove a victim's sexual predisposition" "is not admissible in a criminal proceeding involving alleged sexual misconduct." Utah R. Evid. 412(a). Rule 412 exists to avoid "humiliating the accuser, discouraging victims from reporting sexual crimes against them,

and introducing irrelevant and collateral issues that may confuse or distract the jury." *State v. Tarrats*, 2005 UT 50, ¶ 24, 122 P.3d 581. These policies "are strongly implicated when the complainant is a child." *State v. Marks*, 2011 UT App 262, ¶ 50, 262 P.3d 13.

¶24    An exception to the rule 412 bar on admitting evidence of a victim's prior sexual activity applies if "exclusion would violate the defendant's constitutional rights," Utah R. Evid. 412(b)(3), which includes the Sixth Amendment right to present a defense, *State v. Thornton*, 2017 UT 9, ¶ 74, 391 P.3d 1016. But this right "is far from absolute." *Id.* ¶ 76. The defendant must articulate why the evidence is "essential to the presentation of a defense," *id.* ¶ 78, and why excluding it would be "arbitrary or disproportionate to the purposes [rule 412] is designed to serve," *id.* ¶ 77 (quotation simplified).

¶25    In this case, Rhodes argues that the 412 Evidence was essential to his defense because it would show Child was abused by someone other than Rhodes. In the motion to admit the evidence Rhodes argued that "a significant part of [Rhodes's] defense is that [Child] was indeed abused in 2013" but by someone else.[2]

---

2. Rhodes also argues on appeal that the 412 Evidence would provide "an alternate explanation for [Child's] advanced sexual knowledge and behavior" otherwise known as the "sexual innocence inference." But this theory was never advanced at trial. Evidence of Child viewing pornography was introduced so the State never argued that the jury should infer that Child's advanced sexual knowledge could come only from his encounters with Rhodes. We reject Rhodes's argument regarding the "sexual innocence inference" because "the source of [Child's] sexual knowledge was never placed in issue" and "the

(continued…)

¶26 The district court ruled that the 412 Evidence was inadmissible and concluded that Rhodes's "interpretation of what would be a constitutional and due process defense would really render rule 412 . . . meaningless and the specific limitations of rule 412 or the exceptions to rule 412 meaningless." We conclude that the court did not abuse its discretion in excluding the 412 Evidence.

¶27 The district court ruled that the 412 Evidence was speculative. When it questioned Rhodes about how the 412 Evidence would show that Child was confused about the identity of the perpetrator, he responded that the evidence was "circumstantial." He stated it would be helpful if there was "more information about what happened with this event where the two boys [were] found naked" and that although the allegations are "at some level conjecture . . . [it] doesn't mean [they are] incorrect." The court concluded there was "no connection" between the 412 Evidence and the allegations against Rhodes to show Child confused Rhodes with someone else.

¶28 We agree the 412 Evidence was too speculative to be considered "essential" to Rhodes's defense. The fact that Child instigated a "game" with another boy his age in which they

---

(…continued)
prosecutor did not argue that [Child] lacked the sexual knowledge to fabricate the charges." *State v. Clark*, 2009 UT App 252, ¶ 17, 219 P.3d 631.

He also argues the district court "rejected [his] rule 412 motion out-of-hand, without engaging in any kind of analysis whether [his] constitutional rights required the admission of [the 412 Evidence]." This is not true. The court engaged in a careful and meaningful analysis of the constitutional arguments made, as discussed *infra* ¶¶ 26–29.

touched each other's penis and anus does not support a theory that Child mistakenly identified Rhodes, an adult male, as the perpetrator of the charged crimes. Importantly, the incident involving the other child did not include performing oral sex, which was the primary allegation against Rhodes. *See Marks*, 2011 UT App 262, ¶ 40 ("[D]issimilar sexual activity has little relevance to a child's ability to fabricate allegations of sexual abuse against a defendant."). Rhodes has, at most, created an inference that Child was involved in other sexual activity with a male peer. This inference is too speculative to be considered "essential" to his defense that Child confused Rhodes with someone else. *See Thornton*, 2017 UT 9, ¶ 78. To the contrary, the 412 Evidence is arguably helpful to the State's case. The evidence may have supported the inference that Child was acting out after Rhodes sexually assaulted him—it does not show that Rhodes did not abuse Child or that he was confused as to who did.

¶29   Because the 412 Evidence was not essential to Rhodes's defense, the district court did not abuse its discretion in finding that its exclusion did not violate Rhodes's Sixth Amendment right to present a defense. Excluding the 412 Evidence in this case was not arbitrary or disproportionate to rule 412's purpose of avoiding "humiliating the accuser, discouraging victims from reporting sexual crimes against them, and introducing irrelevant and collateral issues that may confuse or distract the jury." *Tarrats*, 2005 UT 50, ¶ 24.

B.     Ineffective Assistance of Counsel

¶30   Next Rhodes argues his counsel was ineffective for failing to object to what he characterizes as Grandmother's misleading testimony at trial. Rhodes contends Grandmother's testimony demonstrated "an alternate version of the facts, misleading the

jury into believing that [Child] disclosed to his therapist in 2013 that [Rhodes] was his abuser."[3]

¶31　Rhodes argues his trial counsel was ineffective for failing to object to Grandmother's testimony. To succeed on his ineffective assistance of counsel claim, Rhodes must show "(1) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) that but for counsel's performance there is a reasonable probability that the outcome of the trial would have been different." *State v. Lane*, 2019 UT App 86, ¶ 31, 444 P.3d 553 (quotation simplified).

---

3. Rhodes also challenges parts of the detective's and therapist's testimonies as similarly misleading and creating a misimpression that Rhodes was a suspect in 2013. But as the State correctly points out, these allegedly "misleading" statements were elicited by Rhodes. First, while Rhodes was examining the therapist, the therapist disclosed that Grandmother said she thought Rhodes was sexually abusing Child in 2013. Next, Rhodes complains that during his cross-examination of the detective, the detective testified that he received a report in 2013 of "allegations of inappropriate touching." First, these statements are not misleading. Second, we agree with the State that Rhodes cannot elicit potentially problematic testimony and then claim it requires admission of the 412 Evidence to correct the error. *See State v. Barney*, 681 P.2d 1230, 1231 (Utah 1984) (holding that the "defendant is in no position to request a mistrial" when the "disputed statement was elicited, not by the prosecution, but by defense counsel on cross-examination"). On appeal, Rhodes does not argue that his trial counsel was ineffective for eliciting these statements and therefore we focus our analysis solely on Grandmother's statements.

¶32　Rhodes fails to meet the first prong of his ineffective assistance claim. His counsel did not render deficient performance for failing to object to Grandmother's statements because he subsequently asked the court to clarify her statements and the "misimpression" that the 2013 investigation began in response to Child's disclosure to his therapist that Rhodes sexually abused him. Rhodes's counsel told the court he did not need to introduce the 412 Evidence but could correct this misunderstanding by stating that "an independent investigation was underway on an unrelated matter, and that [Rhodes's] name came up." He argued that this information "would give the jury the correct information as to how the investigation started." The court denied this request and Rhodes has not challenged this ruling on appeal.[4]

---

4. We note that Rhodes also fails to meet the second prong. *See State v. Lane*, 2019 UT App 86, ¶ 31, 444 P.3d 553 (the defendant must show that "but for counsel's [deficient] performance there is a reasonable probability that the outcome of the trial would have been different" (quotation simplified)). There is no reasonable probability that the outcome of trial would have been different if Rhodes had been able to argue to the jury that the 2013 investigation began because of an "unrelated matter" or if counsel had been able to introduce the 412 Evidence. First, the 2013 investigation clearly implicated Rhodes and it was not an unrelated investigation. The 2013 investigation was launched after allegations involving two potential perpetrators: an "unknown male" (who was later identified as Rhodes) and "a neighborhood boy." Second, neither the State nor Rhodes placed any emphasis on Grandmother's allegedly misleading statements. In closing arguments, the State acknowledged that Child did not disclose the abuse in 2013 and gave the jury theories about why Child waited until 2015 to disclose the abuse.

(continued…)

II. CJC Interviews

¶33    Rhodes also argues the district court plainly erred in allowing the jury, during its deliberations, to view the CJC interviews. To demonstrate plain error on appeal, the appellant must show "the existence of a harmful error that should have been obvious to the district court." *State v. Gallegos*, 2018 UT App 112, ¶ 12, 427 P.3d 578 (quotation simplified).

¶34    Rhodes argues the error in sending the interviews to the jury room during deliberations should have been obvious to the district court because our case law clearly explains that the jury should not have access to testimonial exhibits during deliberations. (Citing *State v. Cruz*, 2016 UT App 234, ¶¶ 36–41, 387 P.3d 618 (holding that video recordings of children's CJC interviews are not allowed in jury deliberations).)

¶35    "Under the invited error doctrine, we decline to engage in plain error review when counsel made an affirmative statement that led the court to commit the error." *State v. Ring*, 2018 UT 19, ¶ 20, 424 P.3d 845 (quotation simplified).[5] Rhodes's counsel told the court he thought it was important for the jury to watch the interviews during its deliberations and wanted to make sure it had plenty of time to do so. Rhodes's counsel also repeatedly emphasized to the jury the importance of re-watching the interviews during deliberations. Based on the record before us, it

---

(…continued)
The defense also highlighted the fact that Child did not disclose the abuse until 2015.

5. We note that while it is generally true that testimonial evidence should not be sent back with the jury during deliberations, it is not an error for the court to send this evidence back when the parties stipulate to it.

is clear that a significant portion of Rhodes's trial strategy was to attack the credibility of the allegations Child made in the 2015 interview and as a result, counsel made affirmative statements regarding the importance of re-watching the videos during deliberations as part of a sound trial strategy. *See State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 (holding that "plain error does not exist when a conceivable strategic purpose exists to support the use of the evidence" because courts "should take measures to avoid interfering with potential legal strategy or creating an impression of a lack of neutrality" (quotation simplified)).

¶36    The court did not plainly err in allowing the jury to view the CJC interviews when Rhodes affirmatively urged it to do so in accordance with a sound trial strategy.

### III. Rule 23B Remand

¶37    Finally, Rhodes contends his trial counsel was ineffective for failing to call helpful defense witnesses. Rhodes contends trial counsel should have called one of Rhodes's roommates (Roommate) and one of his employers (Employer). Rhodes contends Roommate would have "testified that he was [Rhodes's] roommate for about 90 days in 2012." And he would have testified that he was "home on Friday, Saturday, and Sunday nights" and that during that time "he never saw Rhodes with any children." According to Rhodes, his trial counsel never contacted Roommate. Rhodes contends his counsel never contacted Employer either, and that Employer would have testified that Rhodes worked for Employer's "asphalt business." Employer would have testified that "[a]sphalt is a seasonal business" and his employees "worked summers . . . till nightfall every day except Sunday." Further "Rhodes had to work every Friday and Saturday" and in the summer, workers "would clock out around 11 pm."

¶38    Because the record does not contain the purportedly "helpful" testimony from these witnesses, we are unable to fully

review this claim on appeal and Rhodes asks that we remand the case under rule 23B of the Utah Rules of Appellate Procedure "for entry of findings of fact, necessary for the . . . determination of a claim of ineffective assistance of counsel" on appeal. Utah R. App. P. 23B(a). To obtain a remand, Rhodes must make "a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.*

¶39    In this case, the factual allegations, even if true, would not support a determination that Rhodes's trial counsel was deficient. To show deficient performance, Rhodes "must overcome the strong presumption that counsel rendered constitutionally sufficient assistance by showing that counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms." *State v. Bruhn*, 2019 UT App 21, ¶ 15, 438 P.3d 1031 (quotation simplified).

¶40    Rhodes contends his counsel was ineffective for failing to contact roommate "even though [Rhodes] asked him to contact [Roommate] and gave [him] an idea of how to find [Roommate]." He argues that the "complete failure to investigate [Roommate's] testimony was ineffective." Rhodes's trial counsel was not deficient in failing to investigate Roommate because he could have reasonably concluded that Roommate's testimony would have provided little value. Based on the affidavits provided, Rhodes has shown that Roommate lived in the same house as Rhodes for a ninety-day period in 2012. Even at its best, this evidence can account only for a ninety-day period and evidence at trial demonstrated that Rhodes was in contact with Child for about a two-year period. The record also shows that Rhodes's trial counsel largely abandoned the alibi defense at trial and instead chose to focus on Child's reliability. This assessment was not deficient. *See State v. Wilcox*, 808 P.2d 1028, 1033 (Utah 1991) (stating that an alibi defense is often not "a realistic

possibility" when a defendant has "continual contact" with a child victim over an extended period).

¶41 Rhodes contends his trial counsel was also ineffective for failing to call Employer "because it helped build [Rhodes's] alibi." Rhodes concedes his counsel did call one of his employers but that the witness "only gave vague estimates about the timeframe that Rhodes worked." He argued Employer could have "helped" Rhodes build a better alibi. This argument fails because Rhodes has not demonstrated that Employer would have been better equipped to testify, more concretely than other witnesses, when Rhodes worked. He claims that Employer would have testified generally when his employees worked and when he would have expected Rhodes was also working. But Rhodes has not offered a "*nonspeculative* allegation of facts, not fully appearing in the record on appeal" to bolster his alibi. Utah R. App. P. 23B(a) (emphasis added).

¶42 Because Rhodes has failed to demonstrate that his trial counsel was ineffective for failing to investigate Roommate and Employer, we deny his motion for a temporary remand under rule 23B of the Utah Rules of Appellate Procedure.

CONCLUSION

¶43 We conclude that the district court did not abuse its discretion in excluding the 412 Evidence. Rhodes's trial counsel did not render ineffective assistance of counsel in failing to object to Grandmother's testimony. Further, any error in allowing the jury to access Child's CJC interviews during its deliberation was invited. Finally, Rhodes has not demonstrated his counsel rendered ineffective assistance sufficient to warrant a rule 23B remand. We affirm his convictions.

————————